**INSURANCE COMPANY OF NORTH AMERICA, Appellant,**

v.

**FREDONIA STATE BANK, Appellee.**

No. 549.

Court of Civil Appeals of Texas, Tyler.

June 24, 1971.

Rehearing Denied July 22, 1971.

Ralph S. Carrigan, Houston, for appellant; Baker & Botts, Houston, of counsel.

Thompson & Stripling, Nacogdoches, Spruiell, Lowry, Potter, Lasater & Guinn, Chas. F. Potter, Tyler, for appellee.

MOORE, Justice.

This is an appeal from a summary judgment. The present controversy is but a phase of the entire litigation arising out of the alleged frauds connected with the ultimate collapse of Sacul State Bank. The Federal Deposit Insurance Corporation (hereinafter referred to as F.D.I.C.) was appointed receiver of Sacul State Bank and in that capacity filed suit against Insurance Company of North America seeking recovery on the Banker's Blanket Bond issued by the insurance company covering the fidelity of A. J. Gordon, Sacul's executive vice president. Insurance Company of North America, appellant, in turn, filed a third party claim against Fredonia State Bank, appellee, alleging that Fredonia participated in a part of the losses accruing to the Sacul State Bank for which the F.D.I.C. sought recovery against appellant. For convenience the parties will sometimes be hereinafter referred to as "F.D.I.C.", "Sacul", "Fredonia", and "the insurance company".

In the main suit F.D.I.C. sued the insurance company alleging fraud and infidelity on the part of A. J. Gordon, executive vice president of the Sacul Bank in misappropriating certain funds of the bank by withdrawing funds on deposit with the nearby Fredonia State Bank in Nacogdoches. Specifically, the F.D.I.C. alleged that on June 23, 1967, (one day before the bank was closed by the State Banking Commissioner), Gordon withdrew $7,000.00 from the account at the Fredonia State Bank and converted the funds to his own use, and sought recovery upon the bond.

Appellant Insurance Company of North America answered the F.D.I.C. suit and then filed a third party action against appellee Fredonia State Bank alleging that if the facts as stated by the F.D.I.C. were true and correct, then Sacul had a cause of action against Fredonia for wrongfully allowing Gordon to withdraw the funds, to which Insurance Company of North America was subrogated and prayed for indemnity. Specifically, the insurance company alleged it was entitled to indemnity from Fredonia because first, A. J. Gordon, as executive vice president, had not been properly authorized by the Sacul Bank to withdraw the funds and, secondly Fredonia breached its contract of deposit in permitting A. J. Gordon to withdraw funds since he was not among those authorized to withdraw funds as shown on the signature card on file with Fredonia Bank.

Fredonia's motion for summary judgment was heard upon the stipulations of the parties, together with two affidavits by Rowland Vannoy, executive vice president of Fredonia State Bank and the deposition testimony of Rowland Vannoy, as well as the deposition testimony of Charles T. Phillips, director of Sacul, Charles Owen Melder, president and director of Sacul and A. J. Gordon, executive vice president of Sacul.

After a hearing on the motion, an interlocutory summary judgment was entered on behalf of Fredonia. Thereafter, upon a

trial of the main suit the trial court entered a final judgment in which the F.D.I.C. was awarded, among other things, judgment against Insurance Company of North America for the $7,000.00 Gordon withdrew from Fredonia, apparently finding that Gordon misappropriated the funds. It is from this portion of the final judgment discharging Fredonia from liability by a summary judgment, that appellant, Insurance Company of North America, has appealed. We affirm the ruling of the trial court.

By a single point of error, appellant urges that the summary judgment must be reversed because the evidence fails to show Gordon had neither actual nor apparent authority to withdraw Sacul's funds from Fredonia. Appellant says that the evidence tending to demonstrate authority was, at most, sufficient only to raise a question of fact and therefore the summary judgment cannot stand.

■ A summary judgment disposing of the entire action on its merits is proper only when it is shown that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant is required to carry the burden of establishing the absence of any such issue; and in determining whether the movant has discharged such burden, the court must view the evidence in a light most favorable to the party opposing the motion, accepting as true all evidence which tends to support his position. The ultimate question is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact. Rule 166–A, Texas Rules of Civil Procedure; McDonald, Texas Civil Practice, Vol. 4, sec. 17.26; Rosas v. Doreen, 402 S.W.2d 813 (Tex.Civ.App., Dallas, 1966); Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.1970).

The undisputed evidence shows that both the Sacul Bank and the Fredonia Bank were situated in Nacogdoches County approximately twenty miles apart. Several months prior to the transaction in question, A. J. Gordon commenced negotiating for controlling interest in the Sacul Bank. Prior to the time he withdrew the funds in question on June 23, 1967, he had acquired approximately fifty-two percent of the bank stock. Subsequent to his gaining control, the Board of Directors discharged the president of the Sacul Bank and elected Charles O. Melder to that position. Mr. Melder, who resided in Houston, was never active in the bank. Approximately two months prior to the withdrawal of the funds in question, Sacul's Board of Directors elected A. J. Gordon as executive vice president. The minutes recited that he was to have "the rights and duties appertaining thereto" and was to be reimbursed for expenses incurred in connection with the performance of his duties. The record further shows that for a considerable time Sacul Bank had carried a deposit with the Fredonia Bank, and had made the withdrawals and deposits from time to time in the regular course of business. At the time Gordon withdrew the funds in question, Fredonia Bank had on file an old signature card authorizing its former president, Perry Schuller, as well as several other employees, to withdraw funds on behalf of the bank. The card did not contain the name of A. J. Gordon, nor is there any other evidence in the record showing that Sacul ever specifically authorized him to withdraw these funds. Gordon testified that after he was elected executive vice president, he temporarily lived in a motel in Nacogdoches, Texas, and conducted business for the bank, making several loans in its behalf. Rowland Vannoy, executive vice president of the Fredonia Bank, testified that after Mr. Gordon had bought control of the bank, Perry Schuller, former president of Sacul, introduced Mr. Gordon to him stating he was the man who had acquired a majority of the stock in the bank. Vannoy also stated in his affidavit that K. D. McAdams, an employee of Fredonia who handled the Sacul account, had reported to him in the regular course of business that A. J. Gordon had been appointed exec-

utive vice president of Sacul. Two of the bank's directors testified that upon being elected executive vice president of the bank, Gordon became the chief executive officer of the bank and took charge of all operations of the bank.

On June 5th and June 9th, 1967, shortly before the transaction in question, Gordon went to the Fredonia Bank and withdrew the sum of $4,100.00 and $700.00 in currency on each of the respective dates and executed a debit slip evidencing the withdrawal. It was stipulated that these funds were transferred by Gordon to the Sacul Bank. On June 23, 1967, Sacul had a balance of $12,199.71 on deposit with Fredonia. On the afternoon of June 23rd, Gordon called Vannoy and asked if he could come to Fredonia after closing hours and withdraw the sum of $7,000.00 preferably in large bills. Vannoy advised that he could. Gordon appeared at the bank after hours and withdrew the funds, executing a debit slip evidencing the withdrawal. According to his testimony, he used the funds for the purpose of making a loan to E. V. Greer, one of Sacul's customers. Greer, however, denied the execution of the note. Apparently this was made the basis of the insurance company's liability in the main suit.

According to Fredonia's executive vice president, Vannoy, he and the other employees of Fredonia relied upon their knowledge that Gordon was executive officer of the bank in disbursing the funds and had no notice of any bad faith on the part of Gordon. On the day after the withdrawal, the State Banking Commissioner closed Sacul Bank due to insolvency.

■ In passing upon the rights of the parties, we must keep in mind that appellant's claim is founded upon the doctrine of subrogation. Broadly defined, subrogation is the substitution of one person in place of another, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim asserted. 53 Tex.Jur.2d, sec. 2, p. 430. A party entitled to subrogation must work through the creditor whose right he claims. If the latter had no rights, the subrogee can have none. 83 C.J.S. Subrogation § 14, pp. 612–613; Navarro Oil Co. v. Cross, Tex.Civ. App., 190 S.W.2d 413, rev. on other grounds, 145 Tex. 562, 200 S.W.2d 616. Therefore in passing upon the rights of appellant, we must view the situation as if Sacul State Bank was asserting lack of authority on the part of Gordon.

■ It is elementary that a bank is bound by the acts of its officer while acting within the scope of his authority either actual or apparent. 8 Tex.Jur.2d, Banks, sec. 185, p. 372. Actual authority includes both express or implied authority.

■ "Implied authority" is actual authority circumstantially proved. It embraces authority to do whatever is reasonably necessary and proper to perform the principal act or transaction the performance of which has been expressly delegated to the agent. 2 Tex.Jur.2d, Agency, sec. 36, pp. 472–473. The evidence shows without dispute that Sacul's Board of Directors, by proper resolution, appointed Gordon "executive vice president." As such, he became an executive officer of the bank. While the record contains no direct evidence showing that the directors of Sacul conferred express authority upon Gordon authorizing the withdrawal of the bank's funds from Fredonia, we think the record conclusively demonstrates that he had implied authority to do so by virtue of the fact that he was shown to be the chief executive officer of the bank. It has been held that the designation of an individual as "executive officer" implies some sort of managerial responsibility for the affairs of the corporation generally and it imports a close connection with the Board of Directors and other high officers of the bank. Bruce v. Travelers, 5 Cir., 266 F.2d 781. By thus conferring managerial responsibilities upon Gordon, both common sense and reason compels the conclusion that the bank must have intended to grant him authority to carry out that responsibility. If

he was to manage the affairs of the bank, he would of necessity have to take charge of funds owned by the bank. Otherwise none of the bank's funds would have been available to him in making loans to its customers. We hold that by appointing Gordon as executive officer, Sacul impliedly granted him actual authority, as a matter of law, to draw drafts against Sacul's account kept with Fredonia. 8 Tex.Jur.2d, Banks, sec. 197; Goldstein v. Union Nat. Bank, 109 Tex. 555, 213 S.W. 584; First Nat. Bank of Ranger v. Price, 262 S.W. 797 (Tex.Civ.App., El Paso, 1924); Farmers' State Bank & Trust Co. of Cjorman v. Central State Bank, 281 S.W. 632 (Tex. Civ.App., Dallas, 1926); Central State Bank v. First State Bank, 276 S.W. 941 (Tex.Civ.App., Dallas, 1925); First State Bank of Garrison v. Commercial State Bank, 34 S.W.2d 297 (Tex.Civ.App., Beaumont, 1931); 1 A.L.R. 693; 67 A.L.R. 970. If Gordon had actual authority to withdraw the funds, it follows that Sacul would have no right of action against Fredonia for reimbursement. Appellant, being subrogated to the rights of Sacul, would likewise have none.

But even in the absence of actual authority we would sustain the summary judgment because we think the record also conclusively establishes apparent authority on the part of Gordon. The doctrine of apparent authority to act as an agent is founded upon the law of estoppel. But in every case, in order to create an estoppel, the authority to act must be based upon facts. The doctrine does not apply unless the person dealing with the agent was misled by the representation or conduct of the principal. He must have been actually misled, and induced to act to his prejudice, by reason of the principal's conduct, he having on his part exercised due diligence to ascertain the truth. Butterworth v. France, Tex.Civ.App., 66 S.W.2d 369, 370, 371; First Texas Joint Stock Land Bank v. Holloway, 77 S.W.2d 301, 302 (Tex.Civ. App., Amarillo, 1934).

It has been said that when a bank opens its doors for business and places officers in charge, persons dealing with them in good faith, and without any notice of any want of authority in such officer, and the act done is in the apparent scope of the officer's authority, whether the officer was actually clothed with such authority or not, the party so dealing would be protected. 8 Tex.Jur.2d, Banks, sec. 191, p. 377.

As we construe the affidavit testimony of Rowland Vannoy, he and the other employees of Fredonia had learned that Gordon had been appointed executive vice president of Sacul prior to the time they disbursed the funds. Vannoy also stated in his affidavit that in small banks such as this, where the bank has an executive vice president and the president is inactive, it is the established custom in the banking business that the executive vice president has general authority to manage the bank and handle its funds. This testimony is without dispute.

Where a general custom has been established by usage in the banking business, evidence of such custom may in some cases be conclusive as to the parties' respective rights. 8 Tex.Jur.2d, sec. 2, p. 289; Farmers' & Merchants' Bank v. Slayden, 8 Tex.Civ.App. 63, 27 S.W. 424 (1894). That such a custom did exist in this instance is demonstrated by the testimony of one of Sacul's directors wherein he stated that after Gordon became executive vice president, the bank became a "one man show" with Gordon being "the man". In view of the established custom, the action of Sacul's board in making Gordon its executive vice president, had the effect of clothing him with apparent authority to manage the bank which would include the authority to take charge of the bank's funds. The evidence shows that Fredonia relied on these facts and disbursed the funds to its prejudice. In these circumstances Sacul would be estopped to deny Gordon's authority, and appellant, as subrogee of Sacul, would likewise be estopped.

**254**

Appellant insists, however, that estoppel is not applicable here because Fredonia did not act in good faith. In this connection the rule seems to be that if the transaction was so out of the usual course of business as to place Fredonia on notice that Gordon was acting in his own behalf or antagonistic to the interest of the bank, then he stood before the Fredonia Bank stripped of his representative capacity and powerless to bind Sacul Bank. First Nat'l Bank of Sutton, W. Va. v. Drovers' & Mechanics' Nat. Bank, 244 F. 135 (Fourth Circuit, 1917). Appellant takes the position that because Gordon appeared at Fredonia after banking hours and requested currency, such circumstances were sufficient to place Fredonia on notice of bad faith on the part of Gordon, or was at least sufficient to create an issue of disputed fact thereon. We do not agree. The record shows that Gordon had withdrawn currency on two previous occasions and that in each instance he placed said funds in Sacul Bank. There is nothing in the record to show that he either did or said anything on this occasion indicating that he intended to divert the funds to his own personal use. It is common knowledge that a bank must have currency on hand in order to maintain its daily operation and serve its customers. We see nothing unusual about his requesting the funds after banking hours. As we view it, these circumstances were not of sufficient probative force to place Fredonia on notice of lack of good faith on the part of Gordon or to raise any issue thereon.

Finally, appellant argues that since Gordon's signature did not appear on the signature card on file with Fredonia, this fact alone was sufficient to show his lack of authority. The signature card contains no language which could be construed as an agreement that only those officers and employees whose signatures appeared thereon were authorized to sign instruments withdrawing funds. While the card was sufficient to authorize withdrawal by those whose signatures appeared thereon, the card did not confer exclusive authority on those agents. The deposit created a relationship of debtor and creditor between Fredonia and Sacul. The account was at all times subject to the control of Sacul and it had a legal right to withdraw the funds at its pleasure by any of its authorized agents. The signature card was a revocable instrument which Sacul could alter or withdraw. Vladikavkazsky Ry. Co. v. N.Y. Trust Co., 263 N.Y. 369, 189 N.E. 456 (N.Y. Court of Appeals, 1934). Gordon in his capacity as executive vice president had authority to take charge of the funds on behalf of the bank irrespective of the fact that others were also authorized to make withdrawals.

The judgment of the trial court is affirmed.