**INTERFIRST BANK DALLAS, N.A., Appellant,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellee.**

No. 05–88–00597–CV.

Court of Appeals of Texas, Dallas.

July 10, 1989.

Rehearing Denied Aug. 8, 1989.

Christopher M. Hewitt, John L. House, Dallas, for appellant.

Stephen K. Yungblut, Gary L. White, Dallas, for appellee.

Before STEWART, ROWE, and BURNETT, JJ.

ROWE, Justice.

NCNB Texas National Bank (Bank), as successor in interest to Interfirst Bank Dallas, N.A., appeals from a judgment which determined that United States Fidelity and Guaranty Company (USF & G) had a superior right to certain funds owed by various prime contractors to certain related subcontractors [1] (Wallace). In six points of error, Bank complains that the trial court erred in concluding that: (1) Wallace forfeited its rights to funds still held by the prime contractors because Wallace committed a material breach of contract by not satisfying claims of all laborers and materialmen; (2) USF & G, as subrogee of the prime contractors, had priority over Bank to the withheld funds; (3) USF & G, as subrogee of lien claimants with unperfected laborers' and materialmen's liens, had priority over Bank to the funds; (4) certain lien claimants had perfected their liens under applicable state law; (5) the terms of USF & G's payment bonds were incorporated into Wallace's subcontracts; and (6) USF & G was entitled to a $30,000.00 reimbursement for its costs and expenses incident to bond claim handling on the International Pavilion Project. For the reasons given below,

we modify the trial court's judgment by deleting the $30,000.00 award for reimbursement and, as modified, affirm.

### General Background

The issue presented in this case is whether USF & G's subrogation rights in certain funds are superior to Bank's perfected security interest in accounts receivable. The funds in dispute are undisbursed progress payments and retainages withheld by the prime contractors under various bonded subcontracts.[2] This complicated case proceeded to trial on stipulated facts. As an appellate court, we are bound by the facts as expressly stipulated by the parties. *See Geo–Western Petroleum Dev., Inc. v. Mitchell,* 717 S.W.2d 734, 736 (Tex.App.—Waco 1986, no writ); *Trinity Universal Ins. Co. v. Bellmead State Bank,* 396 S.W.2d 163, 172 (Tex.Civ.App.—Dallas 1965, writ ref'd n.r.e.).

On October 16, 1981, USF & G and Wallace entered into a Master Surety Agreement. This agreement provides for USF & G to issue payment bonds on all Wallace subcontracts and secures USF & G's interest by subrogating it to all Wallace's rights in the subcontracts. All of the bonds issued under the Master Surety Agreement require USF & G to pay laborers and materialmen without regard to the perfection of liens. All bonded subcontracts between Wallace and the various prime contractors provide that final payments thereunder are not due until all lienable claims of laborers and materialmen have been satisfied. The subcontracts clearly reflect that Wallace was to use funds due from the prime contractors to pay for labor and materials being incorporated into the various projects. The subcontracts do not, however, expressly incorporate USF & G's contractual subrogation rights.

By documents dated December 16, 1981, Bank made loans to Wallace to provide operating capital for its construction business. In exchange, Wallace granted Bank

---

1. Carl P. Wallace Company, Inc., Huffman–Wolfe Company, Carl P. Wallace Company of Louisiana, Inc., and affiliated corporations.

2. We shall refer to these undisbursed progress payments and retainages collectively as "retainages" unless the context indicates otherwise.

a security interest in its accounts and the proceeds of its accounts. Bank properly perfected this security interest. It is clear that Wallace was to devote all funds advanced by Bank to completing the subcontracts according to their terms. Moreover, the Master Surety Agreement was already in place when Bank first advanced funds to Wallace on December 16, 1981, and Bank was familiar with these contractual undertakings as they occurred. Indeed, payment bond coverage on all Wallace subcontracts was an integral feature of Bank's loan commitments.

On August 6, 1984, Wallace filed voluntary bankruptcy. The bankruptcy court entered an order dated September 6, 1984, directing that all payments owed to Wallace under the bonded subcontracts be made to USF & G. On July 30, 1986, the bankruptcy court entered an order directing Wallace to abandon to Bank all its remaining accounts receivable. This order further provided that "this order shall not prejudice or otherwise affect any rights which any sureties may assert as to any of the accounts receivable so abandoned in which they may assert an interest." Thus, the bankruptcy court released the funds from the debtors' estates without determining whether Bank or USF & G had a superior right to such funds.

At the time of its bankruptcy, Wallace had failed to pay in full its obligations to laborers and materialmen under the subcontracts. Accordingly, USF & G was called upon to satisfy these unpaid obligations under the terms of its bonds. The total of these unpaid obligations exceeded the amount of retainages available under the subcontracts. USF & G contends that it is entitled to apply the retainages to help satisfy Wallace's unpaid obligations. Bank argues that it has a superior right to such funds by virtue of its perfected security interest in accounts receivable.

### Four Allen Center Project, Houston, Texas

On April 30, 1982, Carl P. Wallace Company, Inc., entered into a subcontract with Texas Construction, Inc., the prime contrac-

tor, whereby Wallace agreed to provide all labor and materials necessary for the installation of plumbing for the Four Allen Center Project. On that same date, USF & G, as surety, and Wallace, as principal, executed a subcontract labor and material bond and subcontract performance bond in favor of the prime contractor. On the date of the bankruptcies, the prime contractor owed Wallace $121,144.47—$86,833.49 in progress payments and $34,310.98 in retainage withheld pursuant to the subcontract. Also as of that date, Wallace owed several subcontractors for labor and materials.

The prime contractor notified USF & G that Wallace had defaulted under its subcontract and made demand upon USF & G pursuant to the payment bond. USF & G paid the claims of the Wallace subcontractors pursuant to its bond obligations. Only one of the subcontractors had perfected a mechanics' lien in the amount of $772.00. The rights of the other subcontractors to perfect liens had expired prior to the dates upon which USF & G received notice of, or paid, the claims. The prime contractor then paid USF & G the entire $121,144.47 balance remaining in the Wallace subcontract. Bank has made demand for $120,372.47, which represents the $121,144.47 balance less the $772.00 paid to the perfected lien claimant.

### Buena Vista Palace Hotel Project, Buena Vista, Florida

On September 8, 1981, Carl P. Wallace Company, Inc., entered into a subcontract with the prime contractor, Pavarini Construction Company, whereby Wallace agreed to furnish all labor and materials necessary for the installation of a heating, ventilating, and air conditioning system and plumbing for the Buena Vista project. On September 16, 1981, USF & G, as surety, and Wallace, as principal, executed a subcontract labor & material bond and a subcontract performance bond in favor of the prime contractor. Wallace had completed the performance of the work under its subcontract before its bankruptcy. There was a balance remaining with the

prime contractor in the Wallace subcontract in the sum of $88,053.48, which represented retainage withheld pursuant to the terms of the subcontract.

Three subcontractors to Wallace were owed for materials and labor as of the date of bankruptcy. The prime contractor notified USF & G of the money owed to these subcontractors and USF & G paid the claims in full. None of these subcontractors had perfected a mechanics' lien relating to the project. In fact, the rights of each of these subcontractors to perfect a mechanics' lien expired prior to the dates upon which USF & G received notice of, or paid, their claims. The prime contractor paid USF & G the $88,053.48 balance remaining in the Wallace subcontract. Bank has made demand for this balance.

### Farmers Insurance Building Project, Columbus, Ohio

On January 31, 1983, Huffman–Wolfe Company (Wallace) entered into a subcontract with HCB/Peck Contractors, the prime contractor, to provide all labor and materials necessary to furnish and install certain mechanical work for the Farmers Insurance Building. USF & G, as surety, and Wallace, as principal, issued a subcontract labor & material bond and a subcontract performance bond in favor of the prime contractor on February 1, 1983. As of the date of the bankruptcies, certain items of contract, corrective, and warranty work required under the subcontract remained unfinished. At that time, there was a balance remaining in the Wallace subcontract with the prime contractor in the sum of $328,618.75, which represented $39,899.75 in progress payments and $288,719.00 in retainage withheld pursuant to the terms of the subcontract. Also as of that date, certain subcontractors to Wallace were owed for labor and materials furnished pursuant to their subcontracts.

On September 12, 1984, the prime contractor transmitted to USF & G the sum of $187,394.00 from the balance which remained in the subcontract. USF & G distributed this money to Wallace's unpaid subcontractors. The prime contractor incurred $31,030.25 in expenses in completing the contract. After deducting the $187,394.00 paid to USF & G and the $31,030.25 for the prime contractors' expense in completing the subcontract obligations, the balance remaining in the Wallace subcontract totaled $110,194.50.

Three of the Wallace subcontractors paid by USF & G did not perfect mechanics' liens. In fact, the rights of each of these three subcontractors to perfect a mechanics' lien expired prior to the dates upon which USF & G received notice of, or paid, their claims. One of these materialmen filed an untimely mechanics' lien which was released in exchange for payment by USF & G. Four subcontractors timely filed and perfected mechanics' liens relating to the Farmers Project in the amount of $79,588.00. There is insufficient evidence, however, to determine whether some of the other subcontractors had perfected mechanics' lien rights.

Bank asserts a claim to $107,806.00 of the $187,394.00 previously paid to USF & G and to the $110,194.50 balance in the Wallace subcontract. Bank does not assert priority to the $79,588.00 paid to perfected lien claimants or to the $31,030.25 expended by the prime contractor to complete the project. As a result of competing claims to this sum, USF & G and Bank agreed that the $110,194.50 contract balance held by the prime contractor would be paid to Winstead, McGuire, Sechrest & Minick as escrow agent to be held in escrow until entitlement to the funds was agreed by settlement or awarded by final judgment. This money is currently held in the escrow account.

### Ohio State Life Insurance Project, Columbus, Ohio

On January 31, 1983, The Huffman–Wolfe Company (Wallace) entered into a subcontract with the prime contractor, HCB/Peck Contractors, whereby Wallace agreed to provide all labor and materials and services necessary to furnish and install certain mechanical work for the Ohio State Insurance Project. USF & G, as

surety, and the Wallace Company, as principal, executed a subcontract labor & material bond and a subcontract performance bond in favor of the prime contractor on February 1, 1983. As of the date of the bankruptcies, there was a $176,079.02 retainage balance remaining in the Wallace subcontract which the prime contractor had withheld pursuant to the terms of the subcontract. Wallace owed certain subcontractors for labor and materials so the prime contractor made demand upon USF & G that it perform pursuant to its payment bond on the project.

On September 12, 1984, the prime contractor transmitted $132,429.00 to USF & G from the balance which remained in the subcontract with Wallace. The prime contractor incurred costs and expenses in the sum of $33,844.52 in completing the contract. After deducting the $132,429.00 paid to USF & G and the $33,844.52 for the prime contractor's expense in completing the subcontract obligations, the balance remaining in the Wallace subcontract totaled $9,805.50.

Three of Wallace's subcontractors timely filed and perfected liens relating to the Ohio State Project in the amount of $58,003.88. The other subcontractors paid by USF & G failed to timely file and perfect mechanics' and materialmen's liens. Bank asserts a claim to the $9,805.50 balance in the Wallace subcontract with the prime contractor on the Ohio State Project. As a result of competing claims to this sum, the prime contractor, USF & G, and Bank entered into a compromise settlement agreement whereby the parties agreed that the $9,805.50 would be paid to Winstead, McGuire, Sechrest & Minick as escrow agent to be held in escrow until such time as entitlement to such funds was agreed by settlement or awarded by final judgment. Bank also asserts a claim to $64,619.62 of the $132,429.00 previously paid to USF & G by the prime contractor. Bank does not assert a claim to the remainder of $58,003.88 which USF & G paid to satisfy perfected lien claimants.

## International Pavilion Project, New Orleans, Louisiana

On December 2, 1982, Carl P. Wallace, Louisiana, entered into a subcontract with the prime contractor, J.A. Jones Construction Company, whereby Wallace agreed to furnish all labor and materials necessary for the installation of certain mechanical work for the International Pavilion Project. On December 10, 1982, USF & G, as surety, and Wallace, as principal, executed a subcontract payment bond and a subcontract performance bond in favor of the prime contractor. As of the date of the Wallace bankruptcies, Wallace had completed the performance of the work under its subcontract on the International Pavilion Project. At that time, there was a balance remaining in the Wallace subcontract of $327,554.55.

On the date of the bankruptcies, Wallace owed various subcontractors and suppliers $548,745.46 for materials and labor, including $91,200.00 owed to Grinnell Fire Protection Systems Company. The prime contractor paid Grinnell $27,700.00, and Grinnell timely filed and perfected a mechanics' lien in the amount of $63,500.00 for the balance. USF & G paid the claims of some of the Wallace subcontractors totalling $122,455.66, including a $63,500.00 payment to Grinnell in exchange for a release of Grinnell's timely perfected mechanics' and materialmen's lien.

Bank does not assert a claim to the $27,700.00 paid by the prime contractor to Grinnell. Deducting this sum, the balance remaining in the Wallace subcontract totals $299,854.55, which represents $129,016.65 in progress payments and $170,837.90 in retainage. Through declaratory judgment actions, USF & G and Bank have each asserted a claim to the retainage still held by the prime contractor. Bank has conceded, however, that USF & G has a superior right to the $63,500.00 paid to Grinnell in exchange for a release of its lien.

## Surety's Rights to Equitable Subrogation

USF & G has not sought to legally en-

force any contractual rights,[3] but instead has relied upon the doctrine of equitable subrogation. Based upon the stipulated facts, the trial court filed the following conclusions of law with respect to USF & G's claim:

Upon satisfaction of Wallace's debts and subcontract obligations to the prime contractors, USF & G is subrogated to the position and rights of ... the defaulting contractor Wallace.

USF & G's rights of subrogation are equitable principals [sic] and do not depend upon an assignment, a lien, or contract.

Subrogation is said to be of two types: conventional and legal. The latter type is often referred to as equitable subrogation. This type is not dependent upon contract but arises by operation of law or by implication in equity to prevent injustice. For purposes of Texas law, equitable subrogation has been defined as "a legal fiction by force of which an obligation, extinguished by payment made by a third person, is treated as still subsisting for his benefit" or "the procedure by which the equitable rights of one person are worked out through the legal rights of another." *Texas Co. v. Miller,* 165 F.2d 111, 115 (5th Cir.1947); *see also* 73 AM.JUR.2d *Subrogation* §§ 2 & 3 (1964); 83 C.J.S. *Subrogation* § 3 (1953). Application of the doctrine is said to be "the purest of equities," and the courts of Texas are said to be particularly hospitable to it. *Yonack v. Interstate Sec. Co.,* 217 F.2d 649, 651 (5th Cir.1954). The doctrine has been widely applied, both as to governmental and private projects, where the obligation of a contractor under a construction contract is backed by payment bonds issued by a commercial surety. *E.g., Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 141, 83 S.Ct. 232, 237, 9 L.Ed.2d 190 (1962); *Trinity Universal Ins. Co. v. United States,* 382 F.2d 317, 320–21 (5th Cir.1967); *Trinity Universal Ins. Co. v. Bellmead State Bank,* 396 S.W.2d 163, 168

(Tex.Civ.App.—Dallas 1965, writ ref'd n.r. e.); *see also* Cushman, *The Surety's Right of Equitable Priority to Contract Balances in Relation to the Uniform Commercial Code,* 39 TEMP.L.Q. 239 (1966).

In *Trinity Universal Ins. Co. v. Bellmead State Bank,* a case involving a private construction contract, this Court addressed the proper disposition of conflicting claims to retainage asserted by a surety, which had discharged the obligation of its principal, and by a garnishing bank creditor of the contractor. Chief Justice Williams on that occasion, in holding that the surety was entitled to priority over the bank in the retainage, justified the holding on the following principles of subrogation:

That a surety has an independent right growing out of its relationship as such to require the retainage to be applied to contract obligations is well settled by the courts, both federal and state.... It is further well-settled in our law that the surety whose funds go to discharge contractor's obligations is thereby subrogated to the rights of the owner to apply the contract balances to the completion of the project in payment of bills incurred in that connection.... Simply stated, the right of subrogation of the surety is founded solely upon the equitable principle of having paid, pursuant to a bound obligation so to do, what in equity should have been paid by the contractor....

*Id.* at 168.

It is established that as the assignee of a perfected security interest in the accounts and proceeds of a contractor, a lender is entitled to the same right to the funds as his assignor. *See* TEX.BUS. & COM. CODE ANN. § 9.106 (Vernon Supp.1988). Such an assignee cannot, however, take greater rights than his assignor. *See* TEX. BUS. & COM.CODE ANN. § 9.318(a) (Vernon Supp.1988). Here, it is clear that when Wallace granted Bank a security interest in its accounts receivable, Wallace's rights

---

**3.** Any legal contract rights of USF & G covering an assignment for the retainages would be inferior to similar contract rights of Bank because Bank held a perfected security interest therein whereas USF & G did not. On the other hand, an argument is sometimes made that those contractual rights which merely parallel the rights of equitable subrogation are entirely subsumed under equitable principles. 83 C.J.S. *Subrogation* § 3(b) (1953).

were already subject to USF & G's subrogation rights in the event that Wallace failed to satisfy its obligations under the various contracts.

On each project, Wallace's contract with the respective prime contractor expressly required payment of all subcontract suppliers' bills as a condition of completion of the contract obligations. Similar contract language was construed in *Corpus Christi Bank and Trust v. Smith,* where the supreme court held that such a retainage provision was intended to provide incentive for the contractor to finish the project, provide completion funds in case the contractor abandoned the project, and provide funds to remedy defects. 525 S.W.2d 501, 504–05 (Tex.1975). As a result, the retainage provision does not make the laborers and materialmen third party beneficiaries or deprive the contractor of an interest in the retainage. Thus, Bank's position as assignor of Wallace clearly prevails over the position of laborers and materialmen having no perfected liens. *Id.* at 505; *see Citizens Nat'l Bank v. Texas & Pacific Ry. Co.,* 136 Tex. 333, 340–41, 150 S.W.2d 1003, 1007 (1941).

Because of the holding in the *Corpus Christi* case, USF & G cannot defeat Bank's claim to the retainages simply by paying off the laborers and materialmen and thereby succeeding to their rights. USF & G can defeat Bank's claim only by establishing that, because of the posture of the parties, equitable considerations dictate that the retainages be utilized in the first instance to help defray the surety's obligations of satisfying all lienable claims of laborers and materialmen, whether perfected or not. Directly impacting these equitable considerations is the legal issue of whether the traditional right of a surety to equitable subrogation survived the enactment of the secured transactions provisions of Article Nine of the Uniform Commercial Code.

### Effect of UCC on Surety's Subrogation Rights

Although there is some minor difference of opinion on this legal issue, the majority rule clearly appears to be the one which was sanctioned by Justice Robert Braucher[4] in his definitive analysis of the subject in *Canter v. Schlager,* 358 Mass. 789, 267 N.E.2d 492 (1971). According to Justice Braucher's analysis, a surety's subrogation rights are not security interests within the purview of Article Nine. *Id.* at 494. This being the case, the promulgation of the UCC and the enactment of its progeny (such as the Texas Business and Commerce Code) do not adversely affect the pre-Code subrogation rights traditionally afforded to sureties. *Id.; see* 2 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 23–6 (3d ed. 1988) (surety's subrogation rights not a security interest); *accord National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843, 847 (1st Cir.1969). Further, it necessarily follows from Braucher's analysis that a surety's right to equitable subrogation is not adversely affected by the lack of perfection of lien claimants' rights if the surety is obliged to satisfy all lienable claims of laborers and materialmen, whether perfected or not.

The overwhelming and essentially unanimous post-UCC decisions have held that the interest of a surety, such as USF & G, continues to be superior to the claim of a contract assignee, such as Bank. *Transamerica Ins. Co. v. Barnett Bank,* 540 So.2d 113, 117 (Fla.1989); *Mid–Continent Casualty Co. v. First Nat'l Bank & Trust Co.,* 531 P.2d 1370, 1377 (Okl.1975); *accord National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843, 849 (1st Cir.1969); *First Alabama Bank v. Hartford Accident & Indem. Co.,* 430 F.Supp. 907, 911 (N.D.Ala.1977); *Fidelity & Casualty Co. v. Central Bank,* 409 So.2d 788, 790 (Ala.1982); *Alaska State Bank v. General Ins. Co.,* 579 P.2d 1362, 1368 (Alaska 1978); *Argonaut Ins. Co. v. C & S Bank,* 140 Ga.App. 807, 232 S.E.2d 135, 140 (1976);

---

**4.** Justice Braucher, formerly a professor of commercial law at Harvard Law School, assisted in the drafting of the secured transactions provisions of Article Nine of the Uniform Commercial Code.

*United States Fidelity & Guar. Co. v. First State Bank,* 208 Kan. 738, 494 P.2d 1149, 1159 (1972); *Finance Co. of America v. United States Fidelity & Guar. Co.,* 277 Md. 177, 353 A.2d 249, 254 (1976); *Canter v. Schlager,* 358 Mass. 789, 267 N.E.2d 492, 497 (1971); *Travelers Indem. Co. v. Clark,* 254 So.2d 741, 745–46 (Miss.1971); *Jacobs v. Northeastern Corp.,* 416 Pa. 417, 206 A.2d 49, 55 (1965); *Third Nat'l Bank v. Highlands Ins. Co.,* 603 S.W.2d 730, 734 (Tenn.1980).

 For the above reasons, it now becomes apparent that, although each of Bank's first five points of error may technically be well taken, such points do not singularly or collectively entitle Bank to priority in the retainages. With respect to the first point, even if Wallace had substantially performed all four subcontracts, Wallace's failure to meet the "final payment" prerequisite of satisfying all lienable claims for labor and materials would entitle the surety to priority in the retainages. With respect to the second point, although the prime contractor might not itself be legally entitled to pay the retainages directly to laborers and materialmen with unperfected liens, the surety's priority in the retainages is not dependent upon such rights of the prime contractor. With respect to the third point, although laborers and materialmen with unperfected liens may have no direct rights in the retainages, the surety's priority therein is not dependent upon such rights by these claimants. With respect to the fourth point, the surety's priority in the retainages is not dependent upon the perfection of liens by laborers and materialmen since the surety was obliged to satisfy all lienable claims regardless of perfection. With respect to the fifth point, the surety's priority in the retainages is not dependent solely upon the express contractual agreements appearing in its principals' subcontracts; the symbiotic relationship existing between the prime contractor, its subcontractor, its subcontractor's surety, and its subcontractor's lender is of controlling importance. Accordingly, Bank's first five points of error are overruled.

 With respect to Bank's sixth point, the surety is by Bank's concession entitled through subrogation to recoup the $63,500.00 paid on the lien claim of Grinnell Fire Protection System. The surety is not entitled, however, to recover the stipulated $30,000.00 costs and expenses related to its processing of bond claims on the International Pavilion Project. To the extent this recovery of costs and expenses is dependent upon contract, it fails because of the surety's lack of a perfected security interest in the contract rights of its principal. To the extent it is dependent upon subrogation, it fails because a surety's subrogation rights cover only the amount it has paid to discharge its principal obligation. *Phipps v. Fugua,* 32 S.W.2d 660, 663 (Tex.Civ.App.—Amarillo 1930, writ ref'd). Accordingly, Bank's sixth point of error is sustained.

Having overruled Bank's first five points of error and having sustained Bank's sixth point of error, we modify the trial court's judgment by removing the $30,000.00 award in favor of USF & G for costs and expenses related to its processing of claims on the International Pavilion Project. As so modified, we affirm the trial court's judgment.

BURNETT, J., dissents.

BURNETT, Justice, dissenting.

I dissent. I arrive at a different result by relying on controlling Texas law. The majority's reliance on the equitable principles enunciated in *Trinity Universal Ins. Co. v. Bellmead State Bank,* 396 S.W.2d 163 (Tex.Civ.App.—Dallas 1965, writ ref'd n.r.e.), is misplaced because USF & G's right to equitable subrogation did not arise until payment. Thus, for the reasons discussed herein, it is second in time to NCNB's perfected legal right.

In *Trinity Universal,* the surety took over the project when the contractor became financially unable to continue. As a public relations matter, the contractor continued to issue checks to the subcontractors. However, the account on which the checks were drawn was funded by the surety. Prior to the surety's deposits, the contractor contacted the owner and re-

leased its claim to all rights to amounts due under the contract, assigned its interests to the surety and requested that the owner pay the surety. Thus, the owner made progress payments to the surety instead of the contractor. Before the final progress payments and retainages were disbursed to the surety, Bellmead State Bank, as a creditor of the contractor, served the owner with garnishment papers seeking the funds still held by the owner. Interestingly, the contract between the owner and contractor specifically provided "[n]o payments shall be due while the [contractor] is in default in respect of any of the provisions of this proposal." *Trinity Universal*, 396 S.W.2d at 166. Thus, pursuant to the contract, upon default the contractor had no entitlement to the funds pursuant to the express language of the contract.

Bellmead State Bank asserted that the surety must rely on the unfiled assignment from the contractor which was subordinate to the bank's status as a judgment lien creditor under article 260-1 (the predecessor to the present Texas UCC). However, the court disagreed and stated as follows:

> The stipulation [of facts] expressly provided that the fund herein involved represented the retained percentages due under the contract. When the stipulation is reviewed within its four corners, we think there was such a default on the part of the contractor as contemplated by the agreement and that the Surety's independent rights to the fund is founded on its suretyship relationship as such. The rights of the surety in this case, as revealed by the stipulation of facts, does not depend upon an independent assignment, ... therefore we are not here concerned with the application of [the UCC].

*Trinity Universal*, 396 S.W.2d at 168. Thus, the court expressly refused to apply the predecessor to the UCC and appears to have relied upon the express contract language under which the contractor forfeited any rights to money after a default despite any partial performance.

However, the *Trinity Universal* court then went on to discuss a surety's "independent right growing out of its relationship as such to require the retainage to be applied to contract obligations." *Id.* As noted by the majority, the court justified its decision in favor of the surety by stating:

> The rights of the Surety in this case are based upon its payment of the debt of another.... Simply stated, the right of subrogation of the Surety is founded solely upon the equitable principle of having paid, pursuant to a bound obligation so to do, what in equity should have been paid by the contractor.

*Trinity Universal*, 396 S.W.2d at 168. It is this dicta upon which the majority so heavily relies. However, the facts in *Trinity Universal* reveal that the surety had expended the funds *before* Bellmead State Bank's interest attached. Thus, the "equitable principle of having paid" found in that case requires that NCNB's interest take priority over USF & G's claim for the reasons further discussed herein.

Equitable subrogation is the substitution of one party in the place of another, so that he who is substituted succeeds to the rights of the other in relation to the debt. *McBroome–Bennett Plumbing, Inc. v. Villa France, Inc.*, 515 S.W.2d 32, 36 (Tex.Civ. App.—Dallas 1974, writ ref'd n.r.e.); 53 TEX.JUR.3D *Subrogation* § 1 (1964). Texas courts in particular have been partial to this "pure equity" and have often stated:

> The doctrine of subrogation is always given a liberal interpretation and is broad enough to include every instance in which one person, not acting voluntarily has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter.

*McBroome–Bennett*, 515 S.W.2d at 36; *Independence Indemnity Co. v. Republic Nat'l Bank & Trust Co.*, 114 S.W.2d 1223 (Tex.Civ.App.—Dallas 1938, writ dism'd); *Constitution Indemnity Co. v. Armbrust*, 25 S.W.2d 176, 180 (Tex.Civ.App.—San Antonio 1930, writ ref'd); *Galbraith–Foxworth Lumber Co. v. Long*, 5 S.W.2d 162, 167 (Tex.Civ.App.—Dallas 1928, writ ref'd). Courts apply equitable subrogation on behalf of an insurer to prevent an injustice

such as double recovery for an insured. *Ortiz v. Great Southwestern Fire and Casualty Ins.*, 597 S.W.2d 342, 343 (Tex. 1980).

However, it is undisputed that under Texas law, this right of equitable subrogation, which is not dependent on an assignment or contract clause, arises upon *payment* by an insured under indemnity insurance. *See, e.g., Ortiz*, 597 S.W.2d at 344 (fire insurance); *Thoreson v. Thompson*, 431 S.W.2d 341, 347 (Tex.1968) (fire insurance); *Employers Casualty Co. v. Transport Ins. Co.*, 444 S.W.2d 606, 610 (Tex. 1969) (public liability insurance); *State Farm Fire & Casualty Co. v. Leasing Enterprises, Inc.*, 716 S.W.2d 553, 555 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (property insurance); *Allstate Ins. Co. v. Clarke*, 471 S.W.2d 901, 907 (Tex.Civ.App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.) (uninsured motorist insurance); *Campbell v. Jefferson*, 453 S.W.2d 336, 338 (Tex.Civ.App.—Tyler 1970, writ dism'd) (automobile comprehensive insurance); *Wolff v. Commercial Standard Ins. Co.*, 345 S.W.2d 565, 568 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.) (title insurance); *Morales v. Roddy*, 250 S.W.2d 225, 226–27 (Tex.Civ.App.—Eastland 1952, no writ) (property insurance); *Hudson Underwriters Agency v. Ablon*, 203 S.W.2d 584, 585 (Tex.Civ.App.—Dallas 1947, writ dism'd) (theft insurance); *American General Ins. Co. v. Fort Worth Transit Co.*, 201 S.W.2d 869, 870 (Tex.Civ.App.—Forth Worth 1947, no writ) (automobile collision insurance); *Republic Nat'l Bank v. Maryland Casualty Co.*, 184 S.W.2d 496, 499 (Tex.Civ.App.—El Paso 1944, writ ref'd w.o.m.) (fidelity insurance); *New Amsterdam Casualty Co. v. First Nat'l Bank*, 134 S.W.2d 470, 475 (Tex.Civ.App.—El Paso 1939, writ dism'd judmt. cor.) (fidelity insurance); *Co-Operative Furniture Co. v. Southern Surety Co.*, 264 S.W. 201, 203 (Tex.Civ.App.—Beaumont 1924, no writ) (plate glass insurance).

Assuming in the instant case that USF & G has an equitable right to subrogation, under controlling Texas law, it arose upon payment. The majority concedes that USF & G's claim to subrogation is not contractu-al and therefore did not arise by virtue of the Master Surety Agreement executed prior to the Bank's loan. In the stipulated facts before the trial court, USF & G admitted that the Bank had loaned the money to Wallace and perfected its lien before USF & G paid any of the materialmen. Thus, USF & G's subrogation claim would be second in time to the Bank's right to payment secured by its interest in Wallace's accounts receivable. Accordingly, the Bank should prevail under the "first in time is the first in right" rule. *See United States v. City of New Britain*, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954); *Diversified Mortgage Investors v. Lloyd D. Blaylock General Contractor, Inc.*, 576 S.W.2d 794, 807 (Tex.1978). It is also well established that as between competing legal and equitable claims, the legal claim generally prevails. *See Anderson v. Waco State Bank*, 92 Tex. 506, 49 S.W. 1030 (1899). (A prior equitable right does not prevail over a subsequently acquired legal claim provided the legal claim holder was without notice of the pre-existing equitable right). Contrary to the majority's assertions, an injustice would occur if USF & G prevailed in this case under a misapplied theory of equitable subrogation. The proper logic is simple—the Bank expended its funds first and perfected its lien. USF & G could have protected its position by insisting that the mechanics and materialmen file liens as a prerequisite to payment, whether or not such liens were required by contracts with Wallace. This would have insured a right of recourse against the owner of the property. Instead, USF & G seeks to gain an advantage in equity after failing to protect its rights at law. In recognizing the obligations of an insurance company, the Texas Supreme Court has stated that "the loss should be borne by the insurer for that is a risk the insured has paid it to assume." *Ortiz*, 597 S.W.2d at 344.

### Performance Under the Contract by Wallace

In its first point of error, the Bank asserts that the trial court erred in conclud-

ing that, since the Wallace companies did not pay certain claims of subcontractors on the projects, Wallace committed a material breach under its contracts with the prime contractors and therefore had no entitlement to the funds which remain owed to Wallace under those subcontracts to the extent which subcontractors were not paid. Thus, the trial court held that the Bank, as assignee of a security interest in Wallace's accounts receivable, had no interest in those funds. I agree with the Bank's contention that the trial court erred in concluding that Wallace, and thus its assignee Bank, had no claim to the funds. Accordingly, I would sustain point of error number one for the following reasons.

It is established that as the assignee of a perfected security interest in the accounts and proceeds of a contractor, a lender is entitled to the same right to the funds as his assignor. *See* TEX.BUS. & COM. CODE ANN. § 9.106 (Vernon Supp.1988). However, such an assignee cannot take greater rights than his assignor. *See* TEX. BUS. & COM.CODE ANN. § 9.318(a) (Vernon Supp.1988).

USF & G argues that the trial court properly found that Wallace's failure to pay certain of its subcontractors on each of the projects constitutes a material breach and that therefore, Wallace had not substantially performed. On each project, Wallace's contract with the respective prime contractor expressly required payment of all subcontractor supplier bills as a condition of completion of the contract obligations. However, similar contract language was construed in *Corpus Christi Bank and Trust v. Smith*, 525 S.W.2d 501, 505–06 (Tex.1975), where the Texas Supreme court held that such a retainage provision was intended to provide incentive for the contractor to finish the project, provide completion funds in case the contractor abandons the project, and provide funds to remedy defects. *Corpus Christi*, 525 S.W.2d at 504–05. The *Corpus Christi* Court determined that the retainage provision did not, as argued by USF & G, make the materialmen third party beneficiaries or deprive the contractor of an interest in the retainage. Thus, the bank's secured

claim was not defeated. *Id.* at 505; *See Citizens Nat'l Bank v. Texas & Pacific Ry. Co.*, 150 S.W.2d 1003, 1007 (Tex.1941); *East Texas Bank and Trust Co. v. Mid-South Contractors, Inc.*, 451 S.W.2d 782 (Tex.Civ.App.—Tyler 1970, no writ); *Scarborough v. Victoria Bank & Trust Co.*, 250 S.W.2d 918 (Tex.Civ.App.—San Antonio 1952, writ ref'd).

Under Texas law, when a contractor has substantially performed, he is entitled to recover the full contract price less the cost required to remedy the defects. However, the burden is on the contractor to introduce evidence which may be used to measure the amount of the deduction. *Vance v. My Apartment Steak House*, 677 S.W.2d 480, 481–82 (Tex.1984); *BPR Construction & Engineering, Inc. v. Rivers*, 608 S.W.2d 248, 249–50 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). In the instant case, Wallace has substantially performed and the Bank makes no claims to contract funds used to complete the projects or remedy defects.

With regard to the Four Allen Center Project, the stipulated facts reveal that Wallace performed all of its contract obligations with the exception of the air balancing work. However, the parties did not stipulate nor is there any evidence in the record that any funds were expended to remedy this alleged defect. The balance remaining in the Wallace contract was $121,144.47. Of this total, the Bank does not claim priority to the portion used to pay the $772 mechanics' and materialmen's lien filed against the project. However, under the theory of substantial performance, I would hold that Wallace and therefore the Bank as its assignee, is entitled to the difference of $120,372.47 which was paid to USF & G by the prime contractor on September 12, 1985. Likewise, on the Buena Vista project, Wallace had fully performed its contract obligations. Thus, the Bank as Wallace's assignee is entitled to the entire contract balance of $88,053.48 which was paid by the prime contractor to USF & G.

On the Farmer's Project, Wallace had not completed certain items of contract, warranty or correction work. The stipulated

facts reflect that the prime contractor incurred $31,030.25 in expenses in completing Wallace's contract obligations. The amount of the contract balance after deducting these costs of completion was $297,588.50. The Bank does not claim priority to the $79,588 which was expended to satisfy the claims of the perfected materialmen's lien claimants. I would hold that the Bank, by virtue of its perfected security interest in Wallace's accounts receivable, is entitled to $218,000.50, which includes the $110,194.50 held in escrow.

Similarly, on the Ohio State Project, Wallace substantially completed its subcontract obligations subject to certain contract, corrective and warranty work. The stipulated facts reveal that the prime contractor expended $33,844.52 to finish the job. After deduction of completion costs, the balance remaining on the contract was $142,234.50. The Bank does not claim the $53,003.88 paid to satisfy the perfected mechanics' and materialmen's lien claimants. I would hold that under the substantial performance doctrine, the Bank is entitled to the remaining balance, $89,425.12 of which was paid to USF & G and $9,805.50 which is held in the escrow account.

All the work required under the contract with the prime contractor was performed by Wallace on the International Project. Neither the prime·contractor nor USF & G expended any funds for completion. The contract balance due totals $299,854.55 after deduction of the $27,700 paid by USF & G to release a perfected mechanic's lien. I would hold that the Bank has a right to the $299,854.55 balance remaining by virtue of its full performance. Thus, I would hold that the Bank has priority over USF & G to that amount as the holder of a perfected security interest.

*Surety's Rights as Subrogee to Owner*

In its second point of error, the Bank argues that the trial court erred in holding that as subrogee to the prime contractors, USF & G, as surety, has a superior right to the balance owed on the Wallace subcontracts to the extent necessary to pay Wallace's material and labor claimants, whether or not they possessed valid mechanic's liens. I would sustain point of error number two for the reasons discussed herein.

Federal cases have long held in favor of the surety on an equitable subrogation theory. These cases involve United States government contracts and performance bonds required by federal statutes on federal government jobs.[1] The federal cases stress various viewpoints which are not relevant to private litigants in a state justice system.[2] One such viewpoint is that the surety ought to win because it directly helped the United States by completing construction work under a government construction contract, whereas the Bank was but a money lender whose only equity arose when it could show its money was actually used to pay labor and materials which discharged obligations for which the surety would otherwise have been liable.

The federal cases hold that in paying labor and materialmen, the surety becomes subrogated to their rights. However, these cases do not recognize that those laborers and materialmen had no legal rights against the United States as owner. Under state law, contractors who deal with individuals or private entities may seek protected status through compliance with mechanics' and materialmen's lien statutes. See, e.g., TEX.PROP.CODE ANN. ch. 53 (Vernon 1984). Unlike a situation where a government entity is the owner, a contractor or subcontractor on a private project who has properly perfected a lien may demand payment from the owner of the property. *Id.* at § 53.083. Under the Federal Miller Act, the labor and materialmen only

---

1. The Miller Act, 49 Stat. 794 (1935), 40 U.S.C. §§ 270a–d (1958) amended 73 Stat. 279 (1959), 40 U.S.C. §§ 270a–d (Supp. IV 1959–1962) (current version at 40 U.S.C. §§ 270a–d (1982)) and the predecessor Heard Act, 28 Stat. 278 (1894), as amended 33 Stat. 811 (1905).

2. E.g., *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); *McKen-*

*zie v. Irving Trust Co.,* 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945); *In re Gleason Co.,* 452 F.2d 1219 (8th Cir.1971); *National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843 (1st Cir.1969).

had rights against the payment bond surety and against the contractor, whose payment the surety had guaranteed.

The Federal cases also hold that by completing the performance of a defaulting contractor, the surety became subrogated to the contractor's rights. However, these cases do not recognize that the defaulting contractor had only the conditional right to receive sums earned under the contract from the owner and that the contractor may have made a valid assignment of those sums under state law. The federal courts also have held that the surety, by performing under its bond, became subrogated to the rights of the United States, as owner. These holdings stretch the equitable subrogation theory rather thin in view of the fact that the purpose of the surety bond was to comply with the federal Miller Act. The purpose of that Act was to give laborers and materialmen protection which they would not otherwise have had under state mechanics' lien statutes because the United States government is immune from the execution of state liens. These holdings further ignore the fact that the United States, as owner, had the right under government construction contracts to receive performance by the contractor and, under the surety's bond, had the right to have the contractor's performance guaranteed by the surety. Additionally, the United States, as owner, had only the duty to pay money for performance but had no right to receive money to which right the surety could, by performing the contractor's duties, become subrogated.

Under Texas law a contractor who enters a public works contract with the state must obtain specific performance and payment bonds. TEX.REV.CIV.STAT.ANN. art. 5160 (Vernon 1987). Pursuant to article 5160, any such contractor who abandons performance forfeits any claim to further proceeds under the contract until the contractor pays all costs of completion. *Id.* at sec. E. Thus, courts have held that a bank with a perfected security interest in the contractor's accounts receivable likewise has no claim to any progress payments or retained percentages which remain unpaid when the contractor abandons the project.

*First Hutchings–Sealy Nat'l Bank v. Aetna Casualty,* 532 S.W.2d 114 (Tex.Civ.App. —Houston 1975, writ ref'd n.r.e.); *Deer Park Bank v. Aetna Ins. Co.,* 493 S.W.2d 305 (Tex.Civ.App.—Beaumont 1973, no writ); *Travelers Indemnity Co. v. Snyder Nat'l Bank,* 361 S.W.2d 926 (Tex.Civ.App. —Eastland 1952, writ ref'd n.r.e.).

This statute has been strictly construed to allow a surety, as subrogee to the owner, to prevail over a bank with a security interest even if the surety signs a subordination agreement with the bank. *Travelers Indemnity,* 361 S.W.2d at 926. However, as with the Federal Miller Act, the purpose of this article is to protect laborers and materialmen who had worked on or supplied materials for construction of public improvements and whose valid claims could not be enforced by procuring a lien upon the property. *Allis–Chambers Mfg. Co. v. Curtis Elec. Co.,* 259 S.W.2d 918, 921 (Tex.Civ.App.—Austin 1953), reversed in part on other grounds, 153 Tex. 118, 264 S.W.2d 700 (1954).

Accordingly, despite urging by USF & G, I would decline to follow federal precedent or apply article 5160 to private projects. Instead, I consider it in the best interest of the law of the State of Texas to decide the issues in this case based on our understanding of controlling state law as discussed with regard to point of error one. Accordingly, I would sustain the Bank's second point of error.

### Surety's Rights as Subrogee to Materialmen

In its third point of error, the Bank maintains that the trial court's judgment was in error because USF & G, as subrogee to the rights of the materialmen and labor claimants, does not have a superior right to the subcontract balances by virtue of a trust or equitable lien on the funds. In order for an express trust to be created, the settlor must manifest an intention to create a trust in reasonably certain terms. TEX. TRUST CODE ANN. § 112.002 (Vernon 1986). None of the various Wallace subcontracts contain any evidence of intent to create trusts for the benefit of the mechan-

ics and materialmen. In the absence of such intent, a court should not impose a trust. *Spiritas v. Robinowitz*, 544 S.W.2d 710 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.).

Alternatively, USF & G also urges that a statutory trust arose in favor of the mechanics and materialmen. Under Texas law,

> Construction payments are trust funds ... if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

TEX.TRUST CODE ANN. § 162.001 (Vernon 1984). However, this chapter expressly does not apply to a lender. TEX.TRUST CODE ANN. § 162.004(a) (Vernon Supp. 1986); *RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex. 1985). In the absence of an ambiguity, we must follow the clear language of the statute. *Id.* Consequently, under the plain language of the statute, the Bank's priority over the materialmen as a secured creditor is not defeated.

Since the contracts themselves do not manifest an intent to create a trust and the statutory trust contemplated in section 162.004 does not apply to a lender, I conclude that no trust arose in favor of Wallace's mechanics and materialmen. A subrogee has no greater rights in relation to a debt than his subrogor. *Insurance Co. of North America v. Fredonia State Bank*, 469 S.W.2d 248, 252 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.). Accordingly, USF & G as subrogee to the mechanics and materialmen, cannot properly assert a superior claim to the funds by virtue of a trust or equitable lien. I would sustain point of error three.

### *Kirk Williams and Kahoe Air's Liens*

In point of error four, the Bank asserts that there is insufficient evidence to determine and therefore, USF & G failed to prove, that Kirk Williams had timely filed and perfected a valid mechanic's lien on the Farmers Project and that Kirk Williams

and Kahoe Air timely filed and perfected valid mechanics' liens on the Ohio State Project. The only issue involved pertains to the existence of properly filed and perfected mechanics' liens on projects in Ohio.

The parties do not dispute that Ohio law applies as to the perfection of these liens. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420–21 (Tex.1984). Ohio law requires strict compliance with the procedural steps necessary to create a mechanic's lien. *M.J. Kelly Co. v. Haendiges*, 397 N.E.2d 416, 417–18 (Ohio Ct.App.1978). Also, the party which seeks the benefit of the lien bears the burden to plead and prove compliance with the procedures. *See Seybold v. Pitz*, 101 Ohio App. 316, 136 N.E.2d 666, 669 (1955). The Ohio mechanic's lien statute states that specific information must be included in the affidavit including the amount due, property description, name of the owner, and names and addresses of the lien claimant and prime contractor. The affidavit must also be verified. This affidavit must be filed within a specified time and endorsed by the recorder with the date and hour of filing. The statute expressly provides that no exemptions apply to the recording provision. OHIO REV.CODE ANN. § 1311.06 (1988).

A thorough review of the record reveals that none of the liens through which USF & G claims an interest were in evidence. Although the parties stipulated that Williams and Kahoe Air filed liens, there is insufficient evidence for us to conclude that their liens are valid under the Ohio law. Thus, these lien claimants are general unsecured creditors of Wallace who have no priority over the Bank. I would sustain point of error four.

### *Relationship of Surety Bonds and Subcontracts*

In point of error five, the Bank maintains that the trial court was in error when it concluded that the terms of USF & G's payment bonds are "read into and incorporated in" the Wallace subcontracts, that the failure to pay for all labor and materials was a material default under the bond terms and that therefore, Wallace had no

interest in the contract balances to which the Bank's lien could attach.

Under general contract principles, the primary concern of the courts is to give effect to the intentions of the parties as expressed in the instruments. *Ideal Lease Service, Inc. v. Amoco Production Co.*, 662 S.W.2d 951, 952–53 (Tex.1984). In the face of an unambiguous provision, the court must give effect to the contract as written. *Id.; Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex.1981).

Each of the Wallace subcontracts specifies what documents form the contract and the bonds are not included in the list. Additionally, each subcontract contains a clause which states that the subcontract constitutes the entire agreement of the parties. I would conclude that the agreements are unambiguous and thus the bond provisions are not incorporated into the Wallace subcontracts. I would sustain point of error five.

### International Project—Costs and Expenses

In point of error six, the Bank maintains that with respect to the International Project, there is no evidence to support the trial court's decision that USF & G is entitled to $30,000 in expenses for the settlement of the claims under the bonds, together with costs and expenses incurred to recover the contract funds. The stipulated facts provide that the amount of expenses incurred by USF & G was $30,000. With regard to entitlement to that amount, USF & G relies on an indemnity clause from the master surety agreement executed by Wallace and the prime contractor before the Bank acquired its security interest.

I would hold that this claim for fees in the Louisiana suit is premature because the suit is still pending. Additionally, under my analysis USF & G would not prevail in this lawsuit. Thus, I would hold that the evidence is insufficient to support the award of attorney's fees. I would sustain the Bank's sixth and final point of error.

I would reverse the trial court's judgment and render judgment for the Bank. As the prevailing party, I would hold that the Bank is entitled to the stipulated attorneys' fees in the amount of $74,043.06.

In summary, in accordance with my dissenting opinion, I would reverse the judgment of the trial court in favor of appellee United States Fidelity and Guaranty and render judgment that appellant NCNB, recover from appellee United States Fidelity and Guaranty Company as follows:

1. The principal sum of $674,285.87 inclusive of the amount held in escrow by agreement of the parties;

2. prejudgment interest at the annual rate of ten percent (10%) from July 30, 1986 to March 21, 1988, the date of the trial court's judgment;

3. stipulated attorneys' fees in the amount of $73,043.06;

4. costs incurred by appellant in the trial court and of this appeal; and,

5. post-judgment interest at the annual rate of ten percent (10%) per annum on the above principal, interest, fees and costs from March 21, 1988, the date of the trial court's judgment, until paid.

With regard to the balance which is held by the prime contractor on the International Project in Louisiana, I would grant appellant's request for declaratory relief and hold that NCNB has priority over United States Fidelity and Guaranty Company to the balance due Carl P. Wallace of Louisiana on August 6, 1984, less any costs expended to complete Wallace's obligations under the subcontract and less the amount necessary to release any perfected mechanics' and materialmen's liens on the project by Wallace's subcontractors.