783 F.2d 577
 1987 A.M.C. 571
 COASTAL IRON WORKS, INC., Plaintiff-Third Party
Plaintiff-Appellant, Cross- Appellee,
v.
PETTY RAY GEOPHYSICAL, a DIVISION OF GEOSOURCE, INC.,
Defendant-Appellee, Cross-Appellant,
v.
FIDELITY & CASUALTY CO. OF NEW YORK, Third Party
Defendant-Appellee, Cross- Appellant.
 No. 84-2437.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 24, 1986.
 
 Ross, Griggs & Harrison, H. Lee Lewis, Jr., James C. Arnold, Houston, Tex., for Coastal Iron Works, Inc.
 James D. Wise, Jr., Houston, Tex., for Petty Ray Geophysical.
 Gary Norton, Shirley Selz, Corpus Christi, Tex., for Fidelity & Casualty Co. of New York.
 Appeals from the United States District Court for the Southern District of Texas.
 Before REAVLEY, WILLIAMS and HIGGINBOTHAM, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 On December 9, 1977, a fire occurred aboard the M/V DABNEY E. PETTY, a ship equipped for geophysical exploration owned by the Petty Ray Geophysical Division of Geosource, Inc. ("Petty Ray"). The DABNEY PETTY had been undergoing repairs in a shipyard owned by Coastal Iron Works, Inc. ("Coastal"), at the time. This case represents the culmination of attempts by the interested parties to sort out responsibility for that fire which occurred almost a decade ago.
 
 
 2
 Soon after the fire, Coastal sought a declaratory judgment to limit its liability arising out of the fire to $300,000 in accordance with the terms of the ship repair written contract between itself and Petty Ray. Petty Ray filed a counterclaim against Coastal to bar enforcement of this limitation and to recover for all of the damage to the DABNEY PETTY, and for losses resulting from the ship's inactivity. At the time of the fire, Coastal was insured up to the amount of $300,000 under a policy issued by Fidelity & Casualty Company of New York ("Fidelity"). Fidelity subsequently denied Coastal coverage under this policy for the damages caused by the fire because Coastal's employees had not followed certain safety standards while working aboard the DABNEY PETTY. Coastal thereupon filed a third party complaint to compel Fidelity to defend and indemnify it in its suit with Petty Ray in accordance with the terms of the policy.
 
 
 3
 Judgment was entered in October, 1983, following a nonjury trial. The district court found that both Coastal and Petty Ray had failed to use reasonable care to prevent the fire, and it assessed 75 percent liability against Coastal and 25 percent against Petty Ray. Although damages were approximately $1,600,000, the district court found that Coastal was liable to Petty Ray only to the extent of the $300,000 contractual limit contained in the ship repair contract. In addition to the $300,000 cap, Petty Ray, however, was awarded prejudgment interest, attorneys' fees and litigation costs. Finally, on the damage issue, the court found that Coastal was not culpable to the level of gross negligence. The district court then found that Fidelity had wrongfully denied coverage to Coastal and gave judgment ordering Fidelity to pay Coastal the $300,000 owed under the policy along with prejudgment interest and one-half of Coastal's attorneys' fees and litigation costs. The district court found, however, that Coastal was not entitled to recover from Fidelity the attorneys' fees awarded to Petty Ray. All parties filed notices of appeal.
 
 I. FACTS
 
 4
 The DABNEY PETTY was a seismic vessel engaged in the collection of data from the seabed. On December 9, 1977, the DABNEY PETTY entered Coastal's shipyard in Corpus Christi, Texas for some minor repairs. One of these repairs was the replacement of the DABNEY PETTY's sanitary pipe. The fire began during the removal of this pipe.
 
 
 5
 A Coastal crew equipped with an acetylene torch and associated gear set about to accomplish this task by cutting the pipe into small sections and removing them one at a time. While this was being done, polyurethane coating the roof of one of the port tanks aboard the DABNEY PETTY ignited, and fire spread rapidly through the ship causing extensive damage. The polyurethane coating had been installed aboard the DABNEY PETTY by a previous owner. Petty Ray did not know of the polyurethane's installation and thus did not inform Coastal of its presence.
 
 
 6
 When the DABNEY PETTY entered Coastal's shipyard for repair work on December 9, Samuel O. Lucky, the ship's captain, was required to sign a job authorization detailing the work to be done and containing the contractual terms between the parties. One of the terms contained in this job authorization is a "red letter clause" which provides:
 
 
 7
 Furthermore, we undertake to perform work and/or provide public or private berth, wharfage, towage, and other services and facilities ONLY upon the condition, expressly acknowledged by Customer, that we shall not be liable in respect to any one vessel or job, directly or indirectly in contract, tort, or otherwise, to its owners, charterers, underwriters, or representatives for any injury, loss, or damage to such vessel, its cargo, equipment or movable stores, or for any consequences thereto, to said owners, parties in interest, or any third party unless such injury is directly caused by our negligence or the negligence of our employees, and in no event shall aggregrate liability to all such parties in interest for damages sustained by them, as a result of such injury, or such defective workmanship or material, exceed the sum of $300,000.00.
 
 
 8
 The red letter clause appears on the reverse side of the two page repair contract. Captain Lucky, however, subsequently denied reading the liability limitation provision.
 
 
 9
 On the day of the fire, Coastal contacted Fidelity through Fidelity's local agent, Marine Office of America Corporation ("MOAC"). MOAC immediately sent out its agents to conduct a preliminary investigation. Fidelity represented Coastal during the early stages of its dispute with Petty Ray. On May 22, 1979, however, Fidelity informed Coastal that it would not indemnify or defend Coastal for the DABNEY PETTY fire because of Coastal's failure to comply with the standards of the National Fire Prevention Association (NFPA) during the repair work aboard the DABNEY PETTY as required by Fidelity's policy with Coastal. Coastal subsequently filed a third party complaint to compel Fidelity to fulfill its obligations under the insurance contract.
 
 II. LIABILITY FOR THE FIRE
 A. Negligence
 
 10
 A trial court's findings of fact in an admiralty case will be upheld unless they are clearly erroneous. Fisher v. Agios Nicolaos V, 628 F.2d 308, 311 (5th Cir.1980), cert. denied, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981). The district court's apportionment of responsibility for the fire aboard the DABNEY PETTY is such a factual determination. Lewis v. Timco, Inc., 736 F.2d 163, 166 (5th Cir.1984). Our review of the trial record amply supports the district court's finding that Coastal and Petty Ray were comparatively negligent to the extent of 75 percent and 25 percent respectively. Coastal could properly be assessed the greater share of responsibility because of its work crew's failure to abide by the NFPA fire standards while conducting "hot" work aboard the DABNEY PETTY. Coastal's crew failed to check the vessel for flammable materials such as the polyurethane coating and also to post a fire watch as required by these standards. The district court's decision to impose some share of responsibility upon Petty Ray because of its failure to discover the polyurethane aboard the DABNEY PETTY was also not clearly erroneous.
 
 
 11
 The district court's finding that Coastal's conduct fell short of gross negligence must also be upheld as not clearly erroneous. A trial court's finding on gross negligence is similarly afforded deference. Gross negligence is defined as harm willfully inflicted or caused by gross or wanton negligence. Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401, 411 (5th Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982) (Todd I ). The record would not support such a finding.
 
 B. Red Letter Clause
 
 12
 Although the district court found that Coastal was the party primarily at fault for the fire, it determined that Coastal's liability to Petty Ray was limited to $300,000 in accordance with the red letter clause contained in the repair contract between Coastal and Petty Ray. Petty Ray disputes this conclusion by urging that the red letter clause (1) is invalid under the Texas Deceptive Trade Practices Act ("DPTA"); (2) is not a part of the contract between itself and Coastal; (3) is beyond the authority of the DABNEY PETTY's captain to agree to; and (4) is void as against public policy under maritime law. We address each of these contentions in turn.
 
 
 13
 First, Petty Ray contends, that a ship repair contract is not to be interpreted under maritime law. We find this conclusion incorrect. Todd I, 674 F.2d at 412. Although state law may supplement maritime law where maritime law is silent, Continental Oil Co. v. Bonanza Corp., 677 F.2d 455, 461 (5th Cir.1982), on rehearing, 706 F.2d 1365 (1983) (en banc), or where a local matter is at issue, Kamani v. Port of Houston Authority, 702 F.2d 612, 614 (5th Cir.1983), state law may not be applied where it would conflict with maritime law. Powell v. Offshore Navigation, Inc., 644 F.2d 1063, 1065 (5th Cir.1981), cert. denied, 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981). Applying the DTPA in this case to void the red letter clause would create such a conflict.
 
 
 14
 Second, the red letter clause is part of the contract between Coastal and Petty Ray. It is clearly displayed on the back page of the repair contract. Moreover, there is prominent language at the bottom of the front page informing a prospective signer of the existence of important terms and conditions on the reverse side. A reasonably prudent person should have seen the red letter clause.
 
 
 15
 Third, the DABNEY PETTY's captain acted within the scope of his authority in signing the repair contract containing the red letter clause. A ship's captain is master of his vessel in every sense of the word. He has broad authority and responsibility in the ship's successful operation. He has implied authority to enter into agreements to ensure proper care for the ship and its crew. Cox v. Esso Shipping Co., 247 F.2d 629, 633 (5th Cir.1957). We, therefore, hold Petty Ray bound by Captain Lucky's action.
 
 
 16
 Petty Ray had notice of the red letter clause's existence. Previous repair contracts between Petty Ray and Coastal contained this provision. Petty Ray did not repudiate these contracts nor instruct its captains not to sign contracts in the future containing such a red letter clause. Petty Ray's previous course of conduct with Coastal thus would lead a reasonable observer to believe that Captain Lucky had authority to enter into a repair contract containing the red letter clause. Cactus Pipe & Supply Co., Inc. v. M/V Montmartre, 756 F.2d 1103, 1111 (5th Cir.1985).
 
 
 17
 Finally, we hold that the red letter clause is not void as against public policy. A shipyard contract limiting liability will be upheld so long as the parties to the contract have more or less equal bargaining strength. Todd I, 674 F.2d at 410. Both parties in this case appear to be large companies with extensive commercial experience and dealings. They possess sufficient business sophistication and bargaining power for us to conclude that they entered the repair contract knowingly and consensually. We uphold the terms of their bargain.
 
 C. Damages and Costs
 
 18
 As the actual damages to the DABNEY PETTY far exceed the $300,000 limitation of the red letter clause, it is unnecessary for us to scrutinize the district court's computation of damages. For this reason, we decline to review Petty Ray's appeal of the district court's calculation of damages resulting from the DABNEY PETTY's unavailability for use after the fire. We must review, however, the district court's award of attorneys' fees to Petty Ray to determine whether it falls within the red letter clause limitation or not.
 
 
 19
 A tort plaintiff in a maritime case involving a breach of the warranty of workmanlike performance may recover attorneys' fees. Todd I, 674 F.2d at 415. As this is such a case, the district court properly was authorized to award Petty Ray its attorneys' fees. Nonetheless, the district court was incorrect to award these fees over and above the $300,000 limitation of the red letter clause. When attorneys' fees are awarded as a component of general damages, they are subject to contractual limitations. Todd Shipyards Corp. v. Auto Transportation, S.A., 763 F.2d 745, 755 (5th Cir.1985). Attorneys' fees awarded for a breach of the warranty of workmanlike performance are a component of a plaintiff's general relief. Id. at 756.
 
 
 20
 Petty Ray seeks to distinguish this red letter clause from the one we upheld in Todd I with respect to the award of attorneys' fees. Petty Ray argues that while the provision in Todd I encompassed "any loss," the red letter clause in this case speaks only of "injury, loss, or damages to such vessel, its cargo, equipment or movable storage, or for any consequences thereto...." Coastal's red letter clause, Petty Ray maintains, does not include a limitation upon attorneys' fees. Instead, Petty Ray argues that attorneys' fees should be awarded separately.
 
 
 21
 We are not persuaded by this semantic manipulation. The language "any consequences" in Coastal's contract is surely sufficiently broad that it encompasses all general damages including attorneys' fees. Moreover, we discern no significance to Petty Ray's argument that the presence of the word "thereto" in the ship repair contract excludes attorneys' fees from the scope of the red letter clause. The attorneys' fees incurred in seeking to recover for the damages to the DABNEY PETTY are obviously a consequence of the damage to the vessel. We reverse the district court's finding and hold that Petty Ray's attorneys' fees are subject to the red letter clause limitation.
 
 III. COASTAL'S INSURANCE COVERAGE
 A. Exclusions
 
 22
 The principal issue with regard to Coastal's insurance contract is whether or not Fidelity escapes the obligations through the failure of Coastal to abide by its terms. Fidelity contends its obligations under the insurance contract were excused because Coastal violated the fire safety standards called for in the contract. The provision of the insurance contract between Coastal and Fidelity at issue here is paragraph 5(c). That paragraph reads as follows:
 
 
 23
 Notwithstanding anything to the contrary contained in this policy, it is hereby expressly understood and agreed that this insurance does not cover any liability: ... [a]rising in connection with work on an oil burning or oil tank vessel or any craft or vessel previously engaged in carrying explosive or inflammable liquids unless such work is done in accordance with the requirements of the rules and regulations prepared by the National Fire Protection Association or American Bureau of Shipping or any revision or amendment thereof....
 
 
 24
 Coastal argues, on the other hand, that paragraph 5(c) does not apply in this instance because the DABNEY PETTY was not "an oil burning or oil tank vessel or [a] ... vessel previously engaged in carrying explosive or inflammable liquids...." The dispute in this case centers upon the meaning of the terms oil "burning" vessel and vessel used to carry explosive or inflammable liquids.
 
 
 25
 Under Texas law, ambiguous language in an insurance contract must be strictly construed against the insurer. Royal Indemnity Co. v. Marshall, 388 S.W.2d 176, 180 (Tex.1965). This is especially so with regards to insurance policy exceptions and limitations. Blaylock v. American Guarantee Bank Liability Insurance Co., 632 S.W.2d 719, 721 (Tex.1982). This principle of construction reflects a policy that disfavors forfeitures under insurance contracts. Jones v. Mutual Liability Insurance Co. of Wisconsin, 336 S.W.2d 905, 907 (Tex.Civ.App.1960).
 
 
 26
 An ambiguity in an insurance contract exists when the contract's terms are subject to more than one reasonable construction. Ranger Insurance Co. v. Bowie, 574 S.W.2d 540, 542 (Tex.1978). Such a situation occurs with regard to the meaning of the term oil "burning" vessel. Fidelity urges us to adopt what it asserts is the plain meaning of this term. Paragraph 5(c), it claims, applies to any vessel powered by a motor that uses any kind of petroleum product. Because the DABNEY PETTY was powered by a diesel engine it would fall within Fidelity's definition and thus within paragraph 5(c). But so also would virtually every oceangoing vessel. Only sailing ships without auxiliary engines, nuclear powered vessels, and wood or coal burning ships would be excepted from what purports to be an exception.
 
 
 27
 Coastal maintains, instead, that the term oil burning vessel has a technical meaning that does not include vessels such as the DABNEY PETTY. Coastal rests its interpretation of oil burning vessel upon the United States Coast Guard's classification of vessels. Under this classification scheme, the DABNEY PETTY was an oil screw vessel because its engine combusted oil. No burning is involved in this process. An oil burning vessel, on the other hand, is classified as one that burns oil, by open flame, to heat water creating steam that is then used to provide locomotion. Coastal also presented expert testimony supporting the assertion that oil burning provisions in maritime insurance contracts are understood to have the narrower meaning. In reality the contract provision is probably anachronistic. Almost all ocean vessels today use oil in combustion engines. Few, except naval vessels, burn oil in open flame to generate steam for power. Thus the provision covers almost all vessels (Fidelity) or very few (Coastal). If the Fidelity interpretation is correct, the provision could be much simplified by requiring the adherence of all vessels, not just those using oil in some way. Thus it can be said that Fidelity, in drafting the provisions this way, creates a possible trap for the insured because of the ambiguity.
 
 
 28
 Both the Fidelity and the Coastal interpretations are reasonable. Faced with two reasonable constructions, we are required under Texas law to choose the one that affords coverage for the insured. Blaylock, 32 S.W.2d at 721. We must do so even if the construction urged by the insurer may be the "more reasonable" of the two. Glover v. National Insurance Underwriters, 545 S.W.2d 755, 761 (Tex.1977). The Coastal interpretation must prevail under Texas law.
 
 
 29
 Fidelity, nonetheless, contends that paragraph 5(c) applies another way. Fidelity maintains that the DABNEY PETTY carried explosive and inflammable liquids because diesel fuel and cable oil were carried in tanks. We are hard-pressed to characterize this interpretation as a reasonable one. Fidelity's construction would expand this language in paragraph 5(c) to include substances carried by vessels as incidental materials for their operation, not just cargo. If adopted, it would make paragraph 5(c) applicable to any vessel that carried, for example, cleaning fluid or lubricating oil aboard. No evidence was presented to show that this was the parties' intent. Even if we were to accept Fidelity's construction as reasonable, we would have to reject it in favor of Coastal's reasonable construction, limiting this term to cargo.
 
 B. Damages and Costs
 
 30
 We conclude that Coastal must be awarded the $300,000 owed to it by Fidelity under the insurance contract. We must also consider, however, Coastal's claims for attorneys' fees, litigation costs and prejudgment interest over and above the $300,000 policy limit.
 
 
 31
 The district court ordered Fidelity to pay Coastal one-half of its attorneys' fees and litigation costs, $56,800, because the district court held that the Houston General Insurance Company, Coastal's excess insurance carrier for claims above $300,000, also had a duty to defend Coastal. Coastal argues that Fidelity should be responsible for the full amount.
 
 
 32
 Coastal's attorneys' fees and litigation costs comprise two components; those resulting from Coastal's suit with Petty Ray and those incurred by Coastal in its action to compel Fidelity to abide by the insurance contract. The district court failed to separate these two. It awarded Coastal attorneys' fees by dividing Coastal's total attorneys' fees and litigation costs in half. We remand this issue to the district court for a determination of which attorneys' fees and litigation costs were attributable to Coastal's suit with Petty Ray and which were attributable to Coastal's third-party suit against Fidelity. The allocation of Coastal's fees and costs must then be made in accordance with the contract obligations as set out below.
 
 
 33
 Paragraph II of Coastal's insurance policy with Fidelity provides:
 
 
 34
 The cost of defending any suit against the Assured [Coastal] on any claim based on a liability or an alleged liability of the Assured covered by this insurance shall be payable by the Assurers [Fidelity] if the amount of the claim hereunder exceeds the amount deductible under this policy, but these Assurers shall not be liable for the cost or expense of prosecuting or defending any suit unless the same shall have been incurred with the written consent of these Assurers....
 
 
 35
 Fidelity contends this provision provides them the option of defending Coastal, but does not require them to do so. We find this argument unpersuasive. This provision does not provide Fidelity an option to defend Coastal or not, only a right to be notified of legal expenditures before they are undertaken. Furthermore, Fidelity's refusal to defend Coastal altogether rendered this notice provision inoperative. Cf. Ford v. State Farm Mutual Automobile Insurance Co., 550 S.W.2d 663 (Tex.1977) (insurer's denial of liability constituted waiver of insurer's right to consent before insured settled case). Because Fidelity wrongfully denied coverage to Coastal and failed to defend Coastal or compensate it for its defense in its suit with Petty Ray, it is responsible for Coastal's attorneys' fees and litigation costs. Big Town Nursing Homes, Inc. v. Reserve Insurance Co., 492 F.2d 523, 526 (5th Cir.1974).
 
 
 36
 The district court's decision to divide this component of Coastal's attorneys' fees and litigation costs between Fidelity and the excess carrier, Houston General, was proper. See Hardware Dealers Mutual Fire Insurance Co. v. Farmers Insurance Exchange, 444 S.W.2d 583, 590 (Tex.1969). Both companies had obligations to defend Coastal. Fidelity's obligation was for claims under the $300,000 cap of their policy, Houston General's was for claims above this amount.
 
 
 37
 The district court, however, should not have divided in half the attorneys' fees and costs incurred by Coastal in its suit against its own insurer, Fidelity. These costs must be borne entirely by Fidelity. Houston General had no duty to represent Coastal in its dispute with Fidelity. These costs were properly awarded to Coastal under Tex.Rev.Civ.Stat.Ann. art. 2226 because Coastal prevailed in its breach of contract suit with Fidelity. Aetna Fire Underwriters Insurance Co. v. Southwestern Engineering Co., 626 S.W.2d 99, 102 (Tex.App.1981).
 
 
 38
 Finally, we must consider the district court's award of prejudgment interest to Coastal. Texas law permits an award for prejudgment interest on accrued damages. Crown Central Petroleum Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 768 F.2d 632 (5th Cir.1985). With regard to the $300,000 award, therefore, we affirm the district court's award of prejudgment interest. Similarly, Coastal must be awarded prejudgment interest on its recovery of attorneys' fees and litigation costs in the amount determined by the District Court upon remand. Smith v. Davis, 453 S.W.2d 340, 350 (Tex.Civ.App.1970). We also hold that Fidelity must pay Coastal the prejudgment interest awarded Petty Ray on its $300,000 judgment. Seguros Tepeyac, S.A., Compania Mexicana v. Bostrom, 347 F.2d 168, 170 (5th Cir.1965).
 
 IV. CONCLUSION
 
 39
 We affirm the district court's allocation of negligence with regard to the fire aboard the DABNEY PETTY and also the district court's finding that Coastal was not guilty of gross negligence. We uphold the district court's judgment that Coastal's liability for the fire was limited to $300,000 and prejudgment interest in accordance with the red letter clause of the repair contract. We reverse the district court's holding that the award of attorneys' fees to Petty Ray could be made beyond the $300,000 limitation of the red letter clause.
 
 
 40
 We affirm the district court's judgment against Fidelity in favor of Coastal for $300,000 and prejudgment interest for breach of its obligations under the insurance contract. We reverse and remand to the district court the judgment for Coastal's attorneys' fees and litigation costs to enable the court to determine which costs were incurred by Coastal in the defense of the suit by Petty Ray and separately in its suit against Fidelity. Judgment should be awarded against Fidelity for one-half of Coastal's fees and costs incurred in the defense of its suit with Petty Ray and all of Coastal's fees and costs incurred in its suit against Fidelity. The judgment against Fidelity must also include the cost of the prejudgment interest awarded to Petty Ray against Coastal.
 
 
 41
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.