TEXAS EMPLOYERS INSURANCE ASSOCIATION, Plaintiff,

v.

The UNDERWRITING MEMBERS OF LLOYDS, Bermuda Fire & Marine Insurance Company Limited, U.S. Fire Insurance Company, La Belgique Industrielle, S.A., Lexington Insurance Company, Limited, Walbrook Insurance Company Limited and Coinsuring Compa-

nies, Bryanston Insurance Company Limited, St. Katherine Insurance Company Limited, Winterthur Swiss Insurance Company Limited, Compagnie Europeene D'Assurances Industrielles, S.A., Folksam International Insurance Company (U.K.) Limited, CNA Reinsurance of London Limited, Bellefonte Insurance Company (U.K.) Branch, Yasuda Fire & Marine Insurance Company (U.K.) Limited, Stronghold Insurance Company Limited, Pacific and General Insurance Company Limited, Turegum Insurance Company Limited, North Atlantic Insurance Company Limited, Insco Limited, Allianz Versicherungs Aktiengesellschaft, Eisen Und Stahl Ruckversicherungs Aktiengesellschaft, Le Assicurazioni D'Italia Societe Per Aziona, Reaseguradora Nacional De Venezuela Compania Anonima, Chemical Insurance Company, Walbrook Insurance Company Limited, Kingscroft Insurance Company Limited, El Paso Insurance Company Limited, Lime Street Insurance Company Limited, and Mutual Reinsurance Company Limited, Defendants.

Civ. A. No. H–91–357.

United States District Court, S.D. Texas, Houston Division.

Aug. 26, 1993.

400

Mike Phillips, Phillips & Akers, Houston, TX, for plaintiff.

Thomas A. Brusstar and Thomas W. Engelhardt, McCullough, Campbell & Lane, Chicago, IL, Jack G. Carnegie, Holtzman & Urquhart, David Wayne Prasifka, Lorance & Thompson, Houston, TX, Margaret V.W. Foster, Pepper Hamilton & Scheetz, New York City, Warren Royal Taylor, Floyd, Taylor & Riley, Houston, TX, for defendants.

### MEMORANDUM AND ORDER

WERLEIN, District Judge.

This case is one of over 450 civil cases that were transferred last year to this judge in an equalization of the docket. Among the motions pending in this case are a motion to dismiss or in the alternative for summary judgment filed by Defendants, The Underwriting Members of Lloyds, et al[1]. (Docu-

---

1. Defendants' motions for summary judgment and for partial summary judgment were filed by the following parties: The Underwriting Members of Lloyds, Bermuda Fire and Marine Insurance Company, Limited, U.S. Fire Insurance Company, La Belgique Industrielle, S.A., Lexing-

ment No. 32), and motions for partial summary judgment filed by Defendants (Document No. 47), and by Plaintiff, Texas Employers' Insurance Association ("TEIA"), (Document No. 40). After reviewing these motions and the applicable law, the Court concludes that Defendants' motions for summary judgment and partial summary judgment[2] should be GRANTED.

## FACTUAL BACKGROUND

The surviving family of Wilbur Jack Skeen sued Monsanto in 1982, alleging that the chronic myelogenous leukemia which killed Skeen resulted from his exposure to benzene during his employment at Monsanto. TEIA, Monsanto's primary insurer, assumed Monsanto's defense in that case.

Monsanto had both primary and excess liability insurance. TEIA provided the primary layer of insurance under a policy with $1 million per-occurrence loss limits. The TEIA policy expressly provided that TEIA also would defend any applicable proceeding against the insured. The section entitled "Defense, Settlement, Supplementary Payments" set forth TEIA's defense obligations to Monsanto:

As respects the insurance afforded by the other terms of this policy the company [TEIA] shall:

(a) defend any proceeding against the insured seeking such benefits and any suit against the insured alleging such injury and seeking damages on account thereof, even if such proceeding or suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

. . . .

(c) pay all expenses incurred by the company, all costs taxed against the insured in any such proceeding or suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;

(d) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the company's request.

The amounts incurred under this insuring agreement, except settlements of claims or suits, are payable by the company in addi-

---

ton Insurance Company, Walbrook Insurance Company Limited and Coinsuring Companies, Walbrook Insurance Company Limited, Bryanston Insurance Company Limited, St. Katherine Insurance Company Limited, Winterthur Swiss Insurance Company Limited, Compagnie Europeene D'Assurances Industrielles, S.A., Folksam International Insurance Company (U.K.) Limited, CNA Reinsurance of London Limited, Bellefonte Insurance Company (U.K.) Branch, Yasuda Fire & Marine Insurance Company (U.K.) Limited, Stronghold Insurance Company Limited, Pacific & General Insurance Company Limited, Turegum Insurance Company Limited, The Dominion Insurance Company Limited, North Atlantic Insurance Company Limited, Insco Limited, Allianz Versicherungs Aktiengesellschaft, Eisen Und Stahl Ruckversicherungs Aktiengesellschaft, Le Assicurazioni D'Italia Societe Per Aziona, Reaseguradora Nacional De Venezuela Compania Anonima, and Chemical Insurance Company.

Defendants Folksam International Insurance Company, Bellefonte Insurance Company, and CNA Reinsurance of London, not only are movants in the motions described above, but also have separately moved for summary judgment based upon their having participated only in the first layer of excess coverage (Document No. 74).

They therefore additionally contend that their obligations were discharged in full by their payment of the $5 million policy limits in settlement of the *Skeen* claim. Because of my rulings on the principal motions, I find it unnecessary separately to consider this motion.

Defendants British National Insurance Company Limited and Dominion Insurance Company Limited also separately moved for summary judgment (Document No. 34). These two defendants were later dismissed on motion of Plaintiff and their motion for summary judgment is therefore denied as moot.

Notices of bankruptcy have been filed as to defendants Walbrook Insurance Company Limited, Kingscroft Insurance Company Limited (formerly known as Dart Insurance Company Limited), El Paso Insurance Company Limited, Lime Street Insurance Company Limited (formerly known as Louisville Insurance Company Limited), and Mutual Reinsurance Company Limited. Because of the automatic bankruptcy stay applicable to these parties, the Court takes no action in this Order as to them.

2. Defendants' motion for partial summary judgment is "partial" because it deals only with Plaintiff's claims for breach of good faith and fair dealing. No issues remain to be tried after both of Defendants' motions are granted.

tion to the amounts payable under coverage A [Workmen's Compensation] or the applicable limit of liability under coverage B [Employers' Liability].

Defendants, The Underwriting Members of Lloyds, et al., provided two layers of excess liability coverage. The first layer of excess or umbrella coverage provided an additional $5 million in coverage beyond Plaintiff's $1,000,000 indemnity limits, and the second excess layer provided an additional $10 million in coverage for Monsanto. The limits of Defendants' liability were set forth as follows:

Underwriters hereon shall be only liable for the *ultimate net loss* the excess of either:

(a) the limits of the underlying insurance as set out in the attached schedule in respect of each occurrence covered by said underlying insurances,

or

(b) $100,000 ultimate net loss in respect of each occurrence not covered by said underlying insurances,

(hereinafter called the "underlying limits");

and then only up to a further sum as stated in Item 2(a) of the Declarations in all respect of each occurrence—subject to a limit as stated in Item 2(b) of the Declarations [$5 million for the first layer of coverage and $15 million for the second layer] in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and in respect of Personal injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of losses paid thereunder, this Policy subject to all the terms, conditions and definitions hereof shall:

(1) in the event of reduction pay the excess of the reduced underlying limit,

(2) in the event of exhaustion continue in force as underlying insurance.

The inclusion or addition hereunder of more than one Assured shall not operate to increase Underwriters' limits of liability beyond those set forth in the Declarations.

"Ultimate Net Loss" was defined to include:

... the total sum which the Assured, or his Underlying Insurers as scheduled, or both, become obligated to pay by reason of personal injuries, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurers permanent employees.

The second paragraph of this definition, however, added the following caveat:

The Underwriters shall not be liable for expenses aforesaid when such expenses are included in other valid and collectible insurance.

The section entitled "Assistance and Co-operation" further provided that:

The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers or both in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.

The "Loss Payable" provision described when Defendants' liability attached:

Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurers, shall have paid the amount

of the underlying limits on account of such occurrences. . . .

Plaintiffs in the underlying *Skeen* lawsuit against Monsanto won a $108 million verdict, which the trial court later vacated with its Order for a New Trial. The second trial started in January, 1989, and before the case reached judgment, it was settled for $7,250,-000. Settlement costs were borne by TEIA, which paid its full $1 million indemnity limits, and by Defendants, who paid the remaining $6.25 million. The first layer of excess coverage paid $5,000,000; the second layer paid $1,250,000.

TEIA subsequently demanded reimbursement from the excess carriers for $4,057,245 in attorneys' fees and costs spent by TEIA in Monsanto's defense. The demand was rejected, and TEIA filed this lawsuit against the excess carriers. TEIA alleges that Defendants are responsible for defense costs expended in the underlying *Skeen* litigation, and that Defendants' refusal to reimburse TEIA is a breach of Defendants' duty of good faith and fair dealing.

Defendants have moved for dismissal or, alternatively, for summary judgment that TEIA take nothing on its contribution and indemnity claims, arguing that there is no right of contribution owed to the primary insurer by the excess insurers, and that TEIA's indemnity claim fails as a matter of law. Defendants have also moved for partial summary judgment on Plaintiff's claim for breach of the duty of good faith and fair dealing.

Plaintiff's motion for partial summary judgment[3] argues that: (1) TEIA tendered its $1 million limit of liability on October 2, 1987; (2) this alleged tender of the primary limits terminated its obligations and thereby triggered the excess carriers' defense obligations; (3) case law imposes an equitable duty on excess carriers to pay defense costs

incurred before the payment of the underlying limits of liability; and (4) the excess policies are ambiguous.[4]

## DISCUSSION

Summary Judgment is authorized if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The United States Supreme Court has interpreted this rule to mandate the entry of summary judgment after an adequate time for discovery against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The present case involves construction of insurance policies. It is well-settled that interpretation of an unambiguous contract is a question of law for the court. *Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir.1986). The present case can therefore be resolved by summary judgment if the insurance agreements are unambiguous.

## A. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1. *Contribution*

TEIA argues that it is entitled to contribution from Defendants under a theory of equitable subrogation. Subrogation is said to be of two types: conventional (or contractual), and legal. *Interfirst Bank Dallas v. U.S. Fidelity & Guaranty Co.*, 774 S.W.2d 391, 397 (Tex.App.—Dallas 1989, writ denied). The latter is often referred to as equitable subrogation, *i.e.*, subrogation not

---

3. Plaintiff's motion for partial summary judgment and Defendants' motion for partial summary judgment were both filed a few days late, and objections have been lodged on timeliness. Full responses on the merits have been made by the opposing parties, however, and the Court concludes that justice is served by granting leave for late filings and considering all motions on the merits.

4. Alleged ambiguity of the policies cannot be a basis to grant summary judgment to Plaintiff. Plaintiff also opposes Defendants' motions based in part on this same argument. The Court finds the policies are not ambiguous and may be construed as a matter of law.

dependent upon contract but arising by operation of law or by implication in equity to prevent injustice. *Id.* It has been defined as " 'a legal fiction by force of which an obligation, extinguished by payment made to a third person, is treated as still subsisting for his benefit' " or " 'the procedure by which the equitable rights of one person are worked out through the legal rights of another.' " *Texas Co. v. Miller,* 165 F.2d 111, 115 (5th Cir.1947).

■ Defendants argue that since TEIA was not a party to either of the umbrella policies, it lacks standing to pursue such a claim. The Court disagrees. Equitable subrogation does not depend upon a contract but arises by implication in equity to prevent injustice. *Interfirst Bank Dallas,* 774 S.W.2d at 397. Texas courts have upheld an insurer's right to equitable subrogation even without privity between the insurers. *See Liberty Ins. Co. v. General Ins.,* 517 S.W.2d 791, 797 (Tex.Civ.App.—Tyler, 1974, writ ref'd. n.r.e.)[5]; *see also Employers Casualty Co. v. Transport Insurance Co.,* 444 S.W.2d 606, 610 (Tex.1969)[6].

■ No Texas court, however, appears to have considered whether a primary carrier is entitled to equitable contribution from an excess insurer for defense costs incurred before the entry of a judgment or the making of a settlement which exceeds the limits of the primary insurance policy. An encyclopedia provides some initial guidance: "Where the insured maintains both primary and excess policies, the general rule is that an excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted." 14 *Couch on Insurance* 2d § 51:36, at 446. This rule is followed by most jurisdictions which have considered the question. *See, e.g., Signal Companies v. Harbor Ins. Co.,* 27 Cal.3d 359, 165 Cal.Rptr. 799, 804, 612 P.2d 889, 894 (1980) (en banc); *Nabisco, Inc. v. Transport Indemnity Co.,* 143 Cal.App.3d 831, 192 Cal. Rptr. 207, 209 (1983); *Colorado Farm Bureau Mutual Ins. Co. v. North American Reinsurance Corp.,* 802 P.2d 1196, 1198 (Colo.Ct.App.1990); *Occidental Fire & Casualty Co. v. Underwriters at Lloyd's, London,* 19 Ill.App.3d 265, 311 N.E.2d 330, 334 (1974); *Fireman's Fund Ins. Co. v. Rairigh,* 59 Md. App. 305, 475 A.2d 509, 517 (1984); *United States Fire Ins. Co. v. Roberts and Schaefer Co.,* 37 Wash.App. 683, 683 P.2d 600, 603 (1984); *see also Hartford & Indemnity Co. v. Continental National American Ins. Companies,* 861 F.2d 1184, 1185 (9th Cir.1988) (citing *Signal Companies v. Harbor Ins. Co.*); *Ins. Co. of North America v. Medical Protective Co.,* 768 F.2d 315, 323 (10th Cir.1985) (citing *Signal* ); *Molina v. United States Fire Ins. Co.,* 574 F.2d 1176, 1178 (4th Cir. 1978); *Allstate Insurance Co. v. St. Paul*

---

**5.** In *Liberty,* Continental Insurance Company, an excess carrier, sought to recover from Liberty Mutual, a primary carrier, a pro-rata share of the costs of settling a lawsuit arising from an accident involving a common insured. Continental argued that since it discharged Liberty's obligation, it was therefore subrogated to the rights of the insured, who was never a party to Continental's lawsuit. *Id.* at 793. The court held that since the excess carrier was secondarily liable, it was entitled to legal or equitable subrogation against Liberty. *Id.* at 797. The court concluded that: "[t]he doctrine of subrogation is given a liberal application, and is broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter." *Id.*

(citations omitted).

**6.** *Employers Casualty* involved a dispute between two primary carriers, one of which defended and indemnified a mutual insured and then sought

contribution from the other carrier under the "pro rata" or "other insurance" clauses of the policies for a pro-rata sum paid in settlement. The court held that plaintiff was not entitled to summary judgment on that policy language, and approved the rule that:

> Where there are two insurers and the policies of each contain a pro rata or coinsurer clause, each insurer is liable to the insured to its proportion of the loss, and payment by one of a larger amount in no way affects the liability of the others, and gives the one so paying no right to recover the excess paid from the other insurers.

*Id.* at 608 (quoting 16 *Couch on Insurance* 2d § 62:157). The court also noted, however, that the plaintiff was not without a remedy:

> [I]f the subrogation provision in its policy does not authorize recovery by Employers Casualty from Transport of a pro rata part of the sum paid as an attorney's fee in defense of the [underlying] Siegel suit, equitable subrogation does.

*Id.* at 610.

*Fire and Marine Ins. Co.,* 1984 WL 1969, 1 (S.D.N.Y.1984) (citing *Signal*); *Continental Casualty Co. v. Synalloy Corp.,* 667 F.Supp. 1523, 1540 (S.D.Ga.1983) (citing *Signal*); *Federated Mutual Ins. Co. v. Pennsylvania National Mutual Ins. Co.,* 480 F.Supp. 599, 600 (E.D.Tenn.1979), *affirmed,* 659 F.2d 1080 (6th Cir.1981); *Canal Ins. Co. v. Occidental Fire and Casualty Co. of North America,* 462 F.Supp. 512, 513 (W.D.Okla.1978).

A minority, however, hold that "the excess carrier must participate in the defense and share in the cost of defense when it is clear that the potential judgment against the insured may be substantially greater than the amount of the primary policy limits." 14 *Couch on Insurance* 2d, § 51:36, at 446 (and authorities cited therein); *see also Celina Mutual Ins. Co. v. Citizens Ins. Co.,* 133 Mich.App. 655, 349 N.W.2d 547, 550 (1984); *American Excess Ins. Co. v. MGM Grand Hotels, Inc.,* 102 Nev. 601, 729 P.2d 1352, 1354 (1986).

As suggested previously, neither the Texas Supreme Court nor any Texas court of appeals has addressed this issue, and none of the authorities cited by the parties are close-in-point. Defendants, for example, refer to cases involving disputes between primary carriers with policies containing identical "pro-rata" or "other insurance" clauses[7]. *See Employers Casualty Co. v. Transport Insurance Co.,* 444 S.W.2d 606, 607–08 (Tex. 1969); *see also United States Fire Insurance Co. v. Stricklin,* 556 S.W.2d 575, 578 (Tex. Civ.App.—Dallas 1977, writ ref'd. n.r.e.); *Ins. Co. of North America v. Fire Insurance Exchange,* 525 S.W.2d 44, 46 (Tex.Civ.App.—Waco 1975, writ ref'd. n.r.e.). These "pro-rata" clauses are construed to confer on none of the insurers any right of contribution from

the other carriers because the contracts are several, rather than joint. Except for this latter principle, this line of authority offers little guidance in the present case in which a primary carrier is seeking recovery of defense costs from umbrella carriers rather than from another primary carrier.

Nor is the Court persuaded by Plaintiff's reliance on *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577 (5th Cir. 1986). In *Coastal,* a shipyard owner sought a declaratory judgment to limit its liability to $300,000 (as provided in the ship repair contract) for a fire incident causing $1.6 million in damages to a ship in the shipyard. The shipyard owner also sued its primary insurer, which provided insurance up to $300,000, after the insurer refused to defend or indemnify against the ship owner's claims. The Fifth Circuit affirmed liability of the carrier for the $300,000 of insurance and held that it was also liable to the shipyard owner for all of the insured's attorneys' fees and costs incurred in prosecuting its suit against its own carrier. The Court approved the trial court's 50–50 division, however, between the insured's primary carrier (with policy limits of $300,000) and its excess carrier, of the insured's attorneys' fees and costs incurred in defending against the claims of the owner of the damaged ship.[8] The court wrote, without any quotation from the policies, that both carriers had obligations to defend the insured: the primary carrier for claims under the $300,000 cap, and the excess carrier for claims above that amount. *Id.* The holding here—where it appears uncontroverted that "[b]oth companies had obligations to defend [the shipyard owner]"—cannot be viewed as one based on a doctrine of equitable subrogation. Moreover, the case relied

---

**7.** An "other insurance" clause addresses a situation where the claimant may be entitled to indemnification from more than one insurance policy. Such clauses take several forms: (1) that the insurer shall have no liability if there is other insurance (this type of provision is usually referred to as an "escape" clause); (2) that the insurer's liability shall be limited to a proportional share of the loss (such clauses are typically referred to as "pro-rata" clauses); and (3) that the policy shall apply only as excess insurance over any other insurance (this type of clause is usually referred to as an "excess" clause). R.E. Keeton and A.I. Widiss, *Insurance Law: A Guide*

*to Fundamental Principles, Legal Doctrines, and Commercial Practices* § 3.11(a), at 253 (1988).

**8.** The excess carrier does not appear to have been a party to the case, and no issue seems to have been joined between the primary carrier and excess carrier on this point. In fact, it was the insured shipyard owner (not the excess carrier) that successfully persuaded the Fifth Circuit to adjudge 100% liability against its primary carrier for fees and costs incurred in suing the carrier.

upon for authority by the Fifth Circuit, *Hardware Dealers Mutual Fire Ins. Co. v. Farmers Ins. Exchange,* 444 S.W.2d 583, 590 (Tex.1969), involved a fact situation completely dissimilar to the instant case.[9] I conclude that the Fifth Circuit did not consider, much less adopt for Texas, a doctrine of equitable subrogation that must be applied against excess carriers in a case such as the one at bar.

■ Without a Texas case resolving the issue of equitable proration of defense costs among primary and excess carriers, the Court is required to follow the rule which it believes the Texas Supreme Court would adopt. *Balliache v. Fru–Con Construction Corp.,* 866 F.2d 798, 799 (5th Cir.1989); *Green v. Ameranda–Hess Corp.,* 612 F.2d 212, 214 (5th Cir.), *cert. denied,* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980). In making this *Erie* "guess," the Court may consider all available legal sources, including Restatements of Law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and the "majority rule." *Jackson v. Johns–Mansville Sales Corp.,* 781 F.2d 394, 398 (5th Cir.1986) (citing Wright, Miller and Cooper, *Federal Practice and Procedure* § 4507, at 100–03).

The relationship between the excess and primary carriers in this case turns on several provisions of the primary and umbrella policies. The section of the TEIA policy entitled "Defense, Settlement, Supplementary Payments," for example, expressly provides that TEIA shall provide a defense to the insured. It requires TEIA to "defend any proceeding against the insured seeking such benefits and any such suit against the insured alleging such injury and seeking damages on account thereof, even if such proceeding or suit is groundless, false or fraudulent; ..." TEIA is also required to "pay all expenses incurred by the company, all costs taxed against the insured ... until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability...." This section also provides that "[t]he amounts incurred under this insuring agreement, except settlements of claims and suits, are payable by the company in addition to the amounts payable under coverage A [Workmen's Compensation] or the applicable limit of coverage B [Employers' Liability]."

The umbrella policies for both the first and second layers, by contrast, provide that "[t]he Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured...." The excess carriers are responsible only for "the ultimate net loss the excess of either ... the limits of the underlying insurances" or $100,000 for each occurrence not covered by the underlying insurance. While "ultimate net loss" is defined to include all of the insured's legal fees, investigation fees, loss payments and defense costs, such costs or expenses are excluded when they are "included in other valid and collectible insurance." Finally, Condition J of the umbrella policy, entitled "Loss Payable," further provides that "[l]iability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurers, shall have paid the amount of the underlying limits on account of such occurrence."

■ Plaintiff argues that the second paragraph of the definition of "ultimate net loss" and its use of the phrase "other valid and collectible insurance" creates an ambiguity, thus preventing summary judgment. Looking to the plain language of the policy, however, the court finds no ambiguity or inconsistency in the provision. Under Texas law, courts construing an insurance policy must look to the plain language of the contract, and such language must be given effect

9. *Hardware Dealers* involved a "double coverage" dispute between two primary carriers with overlapping and conflicting policies. The insured's daughter was test driving a new car and was involved in a collision with another automobile. The policy covering the dealership provided coverage only if no other valid and collectible liability insurance either primary or excess was available, and the policy covering the insured stated that coverage for a nonowned automobile was excess over any other valid and collectible insurance. Finding these provisions in conflict, the court held that liability should be equally prorated between the two insurers and that each had a duty to defend the daughter of the insured. *Id.* at 589–90.

if the parties' intent can be discerned from that language. *Blaylock v. American Guarantee Bank Liability Ins. Co.*, 632 S.W.2d 719, 721 (Tex.1982) (citing *Glover v. National Ins. Underwriters*, 545 S.W.2d 755 (Tex. 1977)). An ambiguity in an insurance contract exists if the contract's terms are subject to more than one reasonable construction. *Ranger Ins. Co. v. Bowie*, 574 S.W.2d 540, 542 (Tex.1978). This, however, is not such a case. Read in conjunction with the "Loss Payable" section, the first paragraph of the "ultimate net loss" definition simply describes the types of costs and expenses which are included within the definition. The second paragraph describes the point or level at which Defendants' obligations to the insured attach, *i.e.*, after the primary insurer pays its full indemnity limits of $1 million. Far from being inconsistent, such distinctions illustrate the principal feature of an excess liability policy: coverage for certain types of costs above a particular level, below which other insurance applies.

The majority of courts which have considered insurance policies similar to those in the present case have concluded that excess or umbrella carriers are responsible for defense costs only after exhaustion of the primary policy limits. *See* citations, *supra.* Moreover,

> [m]ost courts have held that an excess insurer that has a duty to defend is not obligated to provide a defense if the primary insurer is so obligated. Since the primary insurer's duty, once activated, encompasses the claims that have been made against the insured regardless of whether they are in excess of the primary insurer's policy limits, the excess insurer's duty to defend does not come into existence.

*United States Fire Ins. Co. v. Roberts and Schaefer Co.*, 37 Wash.App. 683, 683 P.2d 600, 603–04 (1984) (quoting A. Windt, *Insurance Claims and Disputes* § 4.11 (1982)).

▆▆▆▆ TEIA argues that proration of defense costs is more equitable and that Defendants would be unjustly enriched if they were not required to contribute to TEIA's defense of the *Skeen* litigation. This argument is without merit. The Court finds no equitable principles that justify departing

from the express obligations embodied in the primary and umbrella policies. In effect, TEIA contends that while the policies in this case stand in the relationship of primary/excess as to the insured's liabilities, they stand as coinsurers for the insured's legal expenses. Yet,

> [t]he perceived risk to an excess insurer is altogether different from the risk to the primary. The primary is involved in all claims large and small. The excess is not even threatened with liability except by claims in excess of primary limits and ultimately bears liability only to the extent that those claims are established beyond the limits of the primary. This risk is evaluated far differently from the risk of primary liability.

*Allstate Insurance Co. v. St. Paul Fire and Marine Ins. Co.*, 1984 WL 1969, *2 (S.D.N.Y. 1984). Where, as in this case, an insured purchases one policy specifically as primary coverage and another as excess coverage, to require the excess insurer to reimburse a primary carrier for amounts that were paid before exhaustion of the underlying policy limits would overturn the reasonable expectations of the parties. *See Hartford Accident and Indemnity Co. v. Continental National American Ins. Co.*, 861 F.2d 1184, 1187 (9th Cir.1989) ("an excess insurer predicates the premiums it charges upon the obligations that it and the primary insurer assume, including the primary insurer's obligation to defend all suits until exhaustion of its liability limits."); *see also Guaranty National Ins. Co. v. American Motorists Ins. Co.*, 981 F.2d 1108, 1109 (9th Cir.1992) ("a true excess policy is one which is specifically intended to only come into play when the limits of the underlying coverage are exhausted. It is issued in anticipation of the existence of the underlying policy and is priced in the belief that the excess carrier will not have to provide a defense.").

In the present case, of course, the exhaustion of the primary policy limits and the settlement of claims in the underlying litigation occurred simultaneously. Even so, courts construing insurance policies under similar circumstances have found no equitable considerations that justify departing from

the express contractual obligations contained in primary and umbrella policies. *See, e.g., Signal Companies v. Harbor Insurance Co.,* 27 Cal.3d 359, 165 Cal.Rptr. 799, 612 P.2d 889 (1980) (en banc); *Colorado Farm Bureau Mutual Ins. Co. v. North American Reinsurance Corp.,* 802 P.2d 1196, 1198 (Colo.Ct.App. 1990). In *Signal,* for example, a primary insurer sought contribution for defense costs from an excess carrier when settlement of the underlying claim exceeded the primary insurance coverage. As in this case, the court was faced with a carrier that was expressly designated as an excess carrier. Considering such obligations, the court concluded that:

> [t]o impose an obligation on Harbor [the excess insurer] to reimburse Pacific [the primary insurer] in contravention of the provisions of its policy could only be justified ... by some compelling equitable consideration. We find no such consideration here. Before seeking Harbor's [the excess carrier's] contribution to the settlement, Pacific acted in all respects for its own benefit. The defense costs at issue were incurred by Pacific in the performance of its contractual obligation to its insured to afford a defense. The expenses were incurred almost entirely prior both to settlement of the litigation and exhaustion of Pacific's policy coverage.

*Id.* 27 Cal.3d at 369, 165 Cal.Rptr. at 805, 612 P.2d at 895. Rejecting the argument that an excess insurer should be required to participate in the defense if a potential claim threatened to invade the excess coverage, the court noted that acceptance of such an idea "essentially would make Harbor [excess] a coinsurer with Pacific [primary] with a coextensive duty to defend Signal." *Id.* at 365, 165 Cal.Rptr. at 803, 612 P.2d at 893. Thus, there was no reasonable basis for assuming that either the insured or the primary carrier reasonably expected that the excess carrier would participate in defense costs beyond the express terms of the policy. *Id.* at 369, 165 Cal.Rptr. at 805, 612 P.2d at 895.

The cases principally relied upon by Plaintiff to support its argument that excess or umbrella carriers have an equitable duty to contribute to costs of defense are not persuasive. In *Millers' Mutual Ins. Ass'n. v. Iowa National Mutual Ins. Co.,* 618 F.Supp. 301 (D.C.Colo.1985), for example, unlike the present case, the defense costs at issue were incurred after the exhaustion of the primary policy limits. In *Guaranty National Ins. v. American Motorists Ins.,* 758 F.Supp. 1394, 1398 (D.Mont.1991), *clarified,* 981 F.2d 1108 (9th Cir.1992), the district court held that equity favors proration of defense costs among several insurers based upon amounts contributed to an ultimate settlement claim. Although it affirmed the district court's decision, the Ninth Circuit noted that the dispute involved two carriers which had each issued primary insurance policies. The case therefore "involved the duty to contribute to defense costs of an insurance company which had issued an insurance policy which was excess by coincidence," and "[i]n a case involving a true excess insurance policy, the equitable factors favoring proration of costs of defense would not, or may not, be present." *Id.* at 1109.

To apportion equitably defense costs between the primary and umbrella carriers in this case would fly in the face of unambiguous policy language and established case law. Defendants' policies for both the first and second layers of insurance were true excess insurance policies. The policies contain phrases such as "Liability ... shall not attach," "shall be only liable" or "ultimate net loss" which are only consistent with a true excess or umbrella policy. As excess policies, their coverage begins only where the responsibility of the primary policy ends. It was TEIA's responsibility, as the primary carrier, to defend Monsanto. This duty included coverage for $1 million in liability as well as costs of defense, which were to be paid "in addition to the amounts payable under ... the applicable limit of liability." The excess carriers, by contrast, had no primary duty to assume Monsanto's defense; and their contractual duty to contribute to costs of defense could only be triggered by exhaustion of the underlying limits of the TEIA policy. Neither the policy language nor the summary judgment evidence suggests that the insurers or the insured reasonably expected that the excess carriers would

participate in defense costs beyond the express terms of their policies.[10]

Moreover, the policies make no reference as to how legal fees or costs should be prorated. Assuming *arguendo* that TEIA is correct and that the policies somehow call for proration of costs incurred before the exhaustion of the underlying policy limits, neither the primary nor the excess policies provides any guidance as to how such costs should be apportioned. The absence of any such provisions further suggests that such apportionment was never contemplated.

Given the absence of any contractual basis from which to infer any obligation on the part of the excess carrier, the Court concludes that under these facts Texas would follow the majority rule and hold that an excess insurer is not obligated to participate in the costs of defense until the primary policy limits are exhausted. The defense costs at issue were incurred before settlement of the underlying litigation and before exhaustion of TEIA's policy limits. Moreover, there is no summary judgment evidence that TEIA made any demands for reimbursement before the settlement was achieved, or that the excess carriers agreed to such. Accordingly, the Court concludes as a matter of law that TEIA is solely responsible for the costs of defense pursuant to the terms of its policy, and that Defendants are not liable to TEIA for any portion thereof.

### 2. *Indemnity*

 TEIA also argues that it has a cause of action against Defendants for indemnity. Plaintiff asserts that it "tendered" its policy limits to Monsanto on October 2, 1987, following the first trial and the $108,000,000 verdict in the *Skeen* litigation. In making this assertion, Plaintiff relies on the affidavit of Mike Hocutt, a home office coordinator and workers' compensation director for TEIA. Hocutt states that the day the verdict came in he telephoned a Monsanto official and made "available" TEIA's $1,000,000 policy limits. Because the excess policies would become underlying insurance upon ex-

haustion of the primary limits, and because the verdict clearly exceeded the policy limits, TEIA argues that this alleged tender effectively "exhausted" its primary coverage, thereby eliminating its liability for further defense costs and obligating Defendants to assume the remaining cost of Monsanto's defense.

 The Court disagrees. TEIA's purported tender of its policy limits is inadequate both under Texas law and the terms of the primary policy. Under Texas law, a "tender" is an unconditional offer by a debtor to pay a sum of money not less than the amount due on the obligation. *Baucum v. Great American Ins. Co. of New York,* 370 S.W.2d 863, 866 (Tex.1963); *Collision Center Paint & Body v. Campbell,* 773 S.W.2d 354, 357 (Tex.App.—Dallas 1989, no writ). A valid and legal tender of money must be accompanied by the actual production of the funds and offer to pay the debt involved. *Baucum,* 370 S.W.2d at 866. As a general rule, a tender of payment must include everything to which the creditor is entitled; any lesser sum is ineffectual. *Collision Center,* 773 S.W.2d at 357 (citing *French v. May,* 484 S.W.2d 420, 426 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.)). The tenderer must relinquish possession of the funds for a sufficient time and under such circumstances as to enable the person to whom it is tendered, without special effort on his part, to acquire its possession. *Baucum,* 370 S.W.2d at 866.

A reading of the primary and umbrella policies in this case reveals that any obligation by the excess carriers to pay defense costs could only have been triggered when the $1 million indemnity limits under the policy were paid into court, *i.e.,* when the *Skeen* claim was settled by payment in 1989, and no earlier. For example, the primary policy requires TEIA to "pay all expenses incurred by the company, all costs taxed against the insured ... until the company has paid or tendered or deposited in court such part of such judgment as does not ex-

---

10. It is at least noteworthy that TEIA made no demand upon the excess carriers for any reimbursement of defense costs until after the underlying litigation was settled and TEIA had paid all of the $4 million in defense costs. This suggests that even TEIA did not adopt its current interpretation of the excess insurers' liabilities until it became an afterthought.

ceed the limit of the company's liability ..." The "Limit of Liability" section of the excess policies similarly provides:

> In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurance by reason of losses paid thereunder, this Policy subject to all the terms, conditions and definition hereof shall:
>
> ... continue in force as underlying insurance.

As the primary insurer, TEIA was responsible for all defense costs incurred prior to the exhaustion of the primary policy limits. Defendants were not obligated to contribute to defense costs before exhaustion of the primary limits, and, as the Court has already noted, Plaintiff's primary obligations were not exhausted until the underlying litigation was settled. Although TEIA makes much of the first $108 million jury verdict, there is no summary judgment evidence that TEIA paid anything based upon this verdict, which the trial court later set aside. Under such circumstances, a mere declaration of tender, unaccompanied by actual payment of settlement or judgment or production of the $1 million policy proceeds cannot, in and of itself, constitute a valid tender of the policy limits. *See Baucum,* 370 S.W.2d at 866; 15 S. Williston, *Williston on Contracts* § 1808, at 421–22 (1972)[11]. Because TEIA's purported tender of the policy limits was not valid under Texas law, Defendants are entitled to summary judgment on Plaintiff's indemnity claim.

### B. THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT

■ Defendants have also moved for partial summary judgment on Plaintiff's claim for breach of the duty of good faith and fair dealing. In its original petition, Plaintiff alleges that the Defendants' refusal to contribute to TEIA's defense costs constitutes a breach of the duty of good faith and fair dealing that, in Plaintiff's estimation, runs from the excess carriers to the primary carrier.

■ Although Texas law imposes a duty of good faith and fair dealing on primary carriers as to excess carriers, so that a primary carrier may not refuse to settle a case within its policy limits when a reasonable primary carrier would do so, *American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480 (Tex.1992), Plaintiff has not cited a single Texas case imposing a reciprocal duty from excess carriers to primary carriers, and the Court's own research has not found one. Moreover, since the court has already concluded as a matter of law that the defense costs at issue here were incurred before the exhaustion of the primary policy limits, and that Defendants had neither an express nor implied duty to share in such costs before exhaustion of the underlying policy limits, it follows that where there is no duty, no duty of good faith and fair dealing could arise. Defendants' motion for partial summary judgment is therefore GRANTED[12].

As for Plaintiff's motion for partial summary judgment, the court has already addressed at some length the issues raised in Plaintiff's motion. Because the Court is persuaded that Plaintiff has no cause of action against Defendants for indemnity, and that neither the primary and umbrella policies nor the case law support the equitable duty

---

11. Professor Williston has defined tender as an offer to perform an obligation, coupled with the present ability to perform, so that absent the refusal to cooperate by the party to whom the tender is made, the obligation would be immediately satisfied. 15 S. Williston, *Williston on Contracts* § 1808, at 418 (1972). He defines the essential elements of tender as follows: (1) an unconditional offer to perform, coupled with a manifested ability to carry out the offer; (2) a production of the subject matter of the contract; (3) the property tendered must not be less than what is due; and (4) if greater, there must be no demand for a return of the excess. *Id.* at § 1810, at 421–22.

12. All remaining Defendants except Folksam International Insurance Company (U.K.) Limited, Bellefonte Insurance Company (U.K.) Branch, and CNA Reinsurance of London Limited have moved for partial summary judgment on Plaintiff's good faith and fair dealing claim. Because the Court is persuaded that no genuine issue of material fact exists as to Plaintiff's good faith and fair dealing claim against these defendants, the Court will grant summary judgment *sua sponte* and dismiss Plaintiff's good faith and fair dealing claim against Folksam, Bellefonte and CNA. *Arkwright–Boston Mfrs. Mutual Ins. Co. v. Aries Marine Corp.,* 932 F.2d 442, 444 (5th Cir.1991).

Plaintiff seeks to impose on Defendants, Plaintiff's motion is therefore DENIED.

## CONCLUSION AND ORDER

Accordingly, it is therefore ORDERED that:

(1) Defendants' Motion for Summary Judgment (Document No. 32) is GRANTED;

(2) Defendants' Motion for Partial Summary Judgment (Document No. 47) is GRANTED;

(3) Plaintiff's Motion for Leave to File Motion for Partial Summary Judgment (Document No. 39) is GRANTED;

(4) Plaintiff's Motion for Partial Summary Judgment (Document No. 40) is DENIED; and

(5) All other motions are DENIED AS MOOT.

(6) Pursuant to Rule 54(b), Fed.R.Civ.P. the Court expressly determines that there is no reason to delay the entry of a Final Judgment as to all defendants except for defendants in bankruptcy (Walbrook Insurance Company Limited, Kingscroft Insurance Company Limited, El Paso Insurance Company Limited, Lime Street Insurance Company Limited, and Mutual Reinsurance Company Limited) as to which the automatic stay applies. Accordingly, a Final Judgment will be entered in favor of all except the bankrupt defendants. The claims of the bankrupt defendants will be administratively closed pursuant to a separate order signed this day.

### *ORDER OF DISMISSAL WITHOUT PREJUDICE*

A petition filed under 11 U.S.C. §§ 301, *et seq.* operates as a stay of a judicial proceeding against the debtor that was commenced before the bankruptcy proceeding. 11 U.S.C. § 362(a)(1). Accordingly,

For the reasons set forth in the separate Memorandum and Order signed by the Court this day it is:

· ORDERED AND ADJUDGED that this case is DISMISSED without prejudice as to defendants Walbrook Insurance Company Limited, Kingscroft Insurance Company Limited, El Paso Insurance Company Limited, Lime Street Insurance Company Limited, and Mutual Reinsurance Company Limited. Plaintiff may reinstate this case upon notice to this Court of the discontinuance of the stay with regard to each bankrupt defendant pursuant to 11 U.S.C. § 362(c)(2), provided such notice is filed within 30 days after the bankruptcy stay is discontinued.

SIGNED at Houston, Texas, this 24th day of August, 1993.